# Exhibit A

# Liberty University Discrimination, Harassment, and Sexual Misconduct Policy

Updated August 14, 2020

## Table of Contents

1.   **Introduction** ................................................................................................. **3**
   1.1   **Statement of Policy** ............................................................................ **3**
   1.2   **Coordination of Policy with Other University Policies, Consolidating Related Matters, and Coordination with Law Enforcement** ................... **4**
2.   **The Office of Equity & Compliance** ........................................................... **5**
3.   **Scope of Policy/Jurisdiction** ...................................................................... **7**
4.   **Definitions** ................................................................................................... **8**
   4.1   **Complainant** ......................................................................................... **8**
   4.2   **Respondent** .......................................................................................... **8**
   4.3   **Third-Party** ........................................................................................... **8**
   4.4   **Witness** .................................................................................................. **8**
   4.5   **Formal Complaint** ............................................................................... **8**
   4.6   **Report** .................................................................................................... **9**
   4.7   **Days** ....................................................................................................... **9**
   4.8   **Supportive Measures** ........................................................................... **9**
5.   **Prohibited Conduct** .................................................................................... **9**
   5.1   **Discrimination** .................................................................................... **9**
   5.2   **Harassment (Non-Sexual)** ................................................................. **10**
   5.3   **Sexual Harassment** ............................................................................ **11**
      5.3.1   Quid Pro Quo .............................................................................. 11
      5.3.2   Unwelcome Conduct .................................................................. 12
      5.3.3   Sexual Assault ............................................................................ 12
      5.3.4   Dating Violence .......................................................................... 12
      5.3.5   Domestic Violence ...................................................................... 13
      5.3.6   Stalking ........................................................................................ 13
      5.3.7   Sexual Exploitation .................................................................... 13
   5.4   **Other Civil Rights Offenses** ............................................................. **14**
      5.4.1   Threats/Harm ............................................................................. 14
      5.4.2   Hazing .......................................................................................... 14
      5.4.3   Bullying ....................................................................................... 15
      5.4.4   Intimidation ................................................................................ 15
      5.4.5   Complicity .................................................................................... 15
   5.5   **Retaliation** ........................................................................................... **15**
   5.6   **False Reporting** .................................................................................. **16**
   5.7   **Non-Compliance with an Informal Resolution Agreement or a No-Contact Directive** ............................................................................................... **16**
6.   **Consent and Incapacitation** ...................................................................... **16**
   6.1   **Consent** ................................................................................................. **16**
   6.2   **Incapacitation** ..................................................................................... **17**
7.   **Confidentiality and Privacy** ...................................................................... **18**
   7.1   **General Confidentiality** .................................................................... **18**
   7.2   **Privacy** ................................................................................................. **18**
8.   **Confidential Resources and Responsible Employees** ............................ **19**
   8.1   **Confidential Resources** ..................................................................... **19**

| | | |
|---|---|---|
| **8.2** | **Responsible Employees** | **19** |
| **8.3** | **Training of Responsible Employees** | **20** |
| **8.4** | **Clery Reporting** | **20** |
| **9.** | **Reporting Options and Resources** | **21** |
| **9.1** | **Emergency Resources and Law Enforcement** | **21** |
| **9.2** | **Confidential Resources** | **22** |
| **9.3** | **Reporting Prohibited Conduct** | **23** |
| | 9.3.1   Anonymous Reporting | 23 |
| | 9.3.2   Amnesty | 23 |
| | 9.3.3   Timeframe for Reporting Not Limited | 24 |
| **10.** | **Review Committee and Timely Warning Notices** | **24** |
| **10.1** | **Review Committee** | **24** |
| **10.2** | **Timely Warning Notices** | **26** |
| **11.** | **General Procedural Considerations** | **27** |
| **11.1** | **Timeframe for Investigation and Resolution** | **27** |
| **11.2** | **Cooperation and Participation of the Parties and Witnesses** | **28** |
| | 11.2.1  The Parties | 28 |
| | 11.2.2  Witnesses | 28 |
| **11.3** | **Withholding Degree, Transcript Notation, and Expungement** | **29** |
| **11.4** | **Advisor of Choice** | **30** |
| **11.5** | **Civil Rights Investigators** | **30** |
| **11.6** | **Standard of Review** | **31** |
| **11.7** | **Record-Keeping Requirement** | **31** |
| **12.** | **Procedures for Resolving Prohibited Conduct** | **31** |
| **12.1** | **Initial Assessment of Reports and Formal Complaints** | **31** |
| | 12.1.1  Contacting the Complainant | 32 |
| | 12.1.2  Complainant Intake | 33 |
| | 12.1.3  Campus Safety Assessment | 33 |
| | 12.1.4  Emergency Restrictions of Respondent | 33 |
| | 12.1.5  Request for Limited Action | 34 |
| **12.2** | **Formal Complaints** | **34** |
| | 12.2.1  Filing a Formal Complaint | 35 |
| | 12.2.2  Notice of Formal Complaint to Parties | 35 |
| | 12.2.3  Mandatory and Discretionary Dismissal of Reports and Formal Complaints | 36 |
| | 12.2.4  No Anonymity for Formal Complaints | 37 |
| | 12.2.5  Respondent Intake | 37 |
| | 12.2.6  Discretion When Discussing the Allegations | 38 |
| **12.3** | **Informal Resolution** | **38** |
| | 12.3.1  Eligibility for Informal Resolution and Other Considerations | 38 |
| | 12.3.2  Procedural Requirements of Informal Resolutions | 39 |
| | 12.3.3  Reaching Informal Resolution | 40 |
| **12.4** | **Formal Resolution Process – Investigation** | **40** |
| | 12.4.1  Gathering and Submitting Evidence | 40 |
| | 12.4.2  Prior Sexual History | 41 |

12.4.3 Prior Disciplinary History.............................................................. 41
12.4.4 Privileged Information and Medical Records................................. 41
12.4.5 Polygraph Test Results .................................................................. 42
12.4.6 Opportunity to Inspect Evidence ................................................. 42
12.4.7 The Investigative Report ............................................................... 42
**13.    Hearing Procedures for Formal Complaints of Sexual Harassment..................42**
**13.1   Appointment of the Hearing Officer................................................43**
13.1.1 Qualifications of the Hearing Officer ............................................ 43
13.1.2 Challenging the Appointment of the Hearing Officer................. 44
**13.2   Hearing Policies and Procedures .....................................................44**
13.2.1 Evidentiary Matters........................................................................ 45
13.2.2 Alternative Hearing Participation Options.................................... 46
13.2.3 Recordings of the Hearing ............................................................ 46
13.2.4 Notice of Hearing Outcome and Sanctions................................. 46
**14.    Resolution of Formal Complaints of Prohibited Conduct Other Than Sexual
Harassment ..............................................................................................................47**
**15.    Sanctions ..........................................................................................................48**
**16.    Appeals ..............................................................................................................48**
**16.1   Appeals Board Composition..............................................................49**
**16.2   Standard of Review for Appeals........................................................50**
**16.3   Determination by the Appeals Board ...............................................50**
**17.    Notice of Final Outcome.................................................................................51**
**18.    Prevention and Awareness Programs .............................................................51**
**19.    External Reporting ..........................................................................................51**
**20.    Annual Review ..................................................................................................51**

# 1.    Introduction

Liberty University ("Liberty" or the "University") is committed to providing a safe and non-discriminatory learning, living, and working environment for all members of the University community.  According to Liberty University's Statement of Mission and Purpose, "[t]hrough its residential and online programs, services, facilities, and collaborations, the University educates men and women who will make important contributions to their workplaces and communities, follow their chosen vocations as callings to glorify God, and fulfill the Great Commission."  This *Discrimination, Harassment, and Sexual Misconduct Policy* ("Policy") is a key component of effectuating the University's mission and its obligations under the law.  All members of the University community are responsible for understanding and following this Policy.

## 1.1    Statement of Policy

Liberty University does not engage in unlawful discrimination or harassment because of race, color, ancestry, religion, age, sex, national origin, pregnancy or childbirth, disability, or military veteran status in its educational programs and activities, which includes admissions and employment.  Liberty University complies with all applicable federal and Virginia laws,

including Title IX of the Education Amendments of 1972 and its implementing regulation 34 C.F.R. Part 106 ("Title IX"); Titles VI and VII of the Civil Rights Act of 1964 ("Title VI" and "Title VII"); the Family Educational Rights and Privacy Act of 1974 ("FERPA"); Section 504 of the Rehabilitation Act of 1973 ("Section 504"); Title I of the Americans with Disabilities Act (the "ADA"); the Age Discrimination in Employment Act of 1967, as amended by the Older Worker's Benefit Protection Act (the "ADEA"); the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), as amended by the Violence Against Women Reauthorization Act of 2013 ("VAWA"); and Va. Code §§ 23.1-805, 806, 808, and 900.  Liberty University maintains its Christian mission and reserves its right to discriminate on the basis of religion to the extent that applicable law respects its right to act in furtherance of its religious objectives. Any inquiries about the application of Title IX to Liberty may be referred to Liberty's Title IX Coordinator, the Assistant Secretary for Civil Rights of the U.S. Department of Education, or both.

This Policy prohibits Discrimination, Harassment (Non-Sexual), Sexual Harassment, Sexual Assault, Sexual Exploitation, Stalking, Domestic Violence, Dating Violence, Intimidation, False Reporting, Retaliation, and other misconduct as defined in Section 4 of this Policy (collectively referred to in this Policy as "Prohibited Conduct").  All forms of Prohibited Conduct under this Policy are regarded as serious University offenses, and as violations of this Policy.  As such, they will result in discipline, including potential separation from the University.  Some forms of Prohibited Conduct may also violate state or federal laws, and civil claims as well as criminal prosecution may occur independently of any disciplinary action imposed by the University.  This Policy is strictly enforced, and the University will respond to Reports and Formal Complaints, as those terms are defined below in Section 4 of this Policy, of Prohibited Conduct with appropriate measures designed to eliminate the Prohibited Conduct, prevent its recurrence, and remedy any adverse effects of such conduct on persons, members of the campus community, and University-related programs and activities.

### 1.2    Coordination of Policy with Other University Policies, Consolidating Related Matters, and Coordination with Law Enforcement

In case of a conflict between this Policy and another University policy, this Policy will govern. Generally, the University prioritizes the reporting and resolution of Prohibited Conduct under this Policy over violations of other University policies.  When conduct involves the potential violations of both this Policy and another University policy, the University may choose to investigate other potential misconduct under the procedures set forth in this Policy, provided that it does not unduly delay a prompt and equitable resolution of the Report or Formal Complaint, or the other application of University policy.  This includes potential violations of another University policy alleged to be motivated on the basis of any protected status.  In addition to this Policy, the conduct of students, faculty, and employees may be governed by other University policies, such as the *Employee Handbook*, the *Faculty Handbook*, *The Liberty Way*, the *Graduate Honor Code*, the School of Law's *Personal Code of Honor*, the Liberty University College of Osteopathic Medicine ("LUCOM")'s *Code of Conduct*, and the *Online Honor Code*.

4

The University's Office of Equity and Compliance ("OEC") has the discretion to consolidate multiple Reports and/or Formal Complaints[1] into a single matter. The OEC may, at the discretion of the Executive Director of Equity and Compliance / Title IX Coordinator, who may consult with other University administrators, investigate other forms of conduct that may be potential violations of other University policies. Such other forms of conduct may be resolved under the procedures of this Policy, in the discretion of the OEC, giving due regard to the Amnesty provision set forth in Section 9.3.2 of this Policy below.

The procedures set forth in this Policy are administrative and educational in nature and are separate and distinct from criminal, civil, and administrative processes of the legal system. Pursuing resolution through procedures in this Policy does not preclude someone from also pursuing actions in that legal system at the same time or in the future. If the conduct in question is alleged to be a violation of both University policy and the law of any government, the University will proceed with its normal process, regardless of action or inaction by outside authorities. Determinations made or sanctions imposed through these or other University procedures are not necessarily subject to change simply because criminal charges or civil complaints arising from the same conduct are dismissed, reduced, or rejected in favor of or against the Respondent. Throughout the investigation and resolution processes set forth in this Policy, the University will maintain its authority to take action to ensure campus safety, which may include imposing interim measures prior to the resolution of a Report or Formal Complaint of Prohibited Conduct, and provide for prompt and equitable resolutions of a Report or Formal Complaint of Prohibited Conduct.

## 2.    The Office of Equity & Compliance

The Office of Equity and Compliance, with executive oversight by the Vice President of Equity and Inclusion, is charged with enforcing this Policy. The Executive Director of Equity and Compliance ("Executive Director") who reports to the Vice President of Equity and Inclusion, is the designated person responsible for addressing reports and complaints, systemic issues, and other general concerns involving discrimination, harassment, and sexual misconduct at the University. The Executive Director has been designated by the University to coordinate the University's compliance with Title IX and, for the purposes of Title IX, the Executive Director also serves as the University's Title IX Coordinator. Liberty notifies applicants for admission and employment, students, and employees (including faculty) of the Executive Director/Title IX Coordinator's contact information (including name, office address, email address, and telephone number) and the University's "Statement of Policy." All concerns, reports, and complaints of discrimination, harassment, and sexual misconduct, even those thought to be beyond the scope of this Policy, should be referred to the University's OEC.

The Executive Director/Title IX Coordinator oversees the investigation and resolution of Reports and Formal Complaints of alleged Prohibited Conduct in accordance with this Policy. The Executive Director/Title IX Coordinator may delegate responsibilities under this Policy

---

[1] The terms "Report" and "Formal Complaint" are defined below in Section 4 of this Policy.

5

to designated University administrators who have appropriate training and/or experience. When used in this Policy, the term Executive Director/Title IX Coordinator may also include a Deputy Coordinator, a Civil Rights Investigator ("Investigator"), or other appropriate designee with such delegated responsibilities.  The Executive Director/Title IX Coordinator oversees the University's centralized response to all Reports and Formal Complaints of Prohibited Conduct to assure consistent implementation of this Policy and compliance with all applicable federal and state laws within the scope of this Policy.  While many University employees may be designated as Responsible Employees, who are required by this Policy to report Prohibited Conduct, only the University's OEC and the University employees listed in this section of this Policy have authority to institute corrective action for Prohibited Conduct. For that reason, the University strongly encourages individuals to make Reports and Formal Complaints of Prohibited Conduct directly to the OEC.

### Contact Information for the Vice President and the Executive Director of the Office of Equity and Compliance/Title IX Coordinator

Greg Dowell
Vice President for Equity and Inclusion, Chief Diversity Officer
434.592.3888
titleix@liberty.edu

Nathan Hopkins, J.D.
Executive Director of Equity and Compliance / Title IX Coordinator
1971 University Blvd.
Green Hall, Rm. 1845K
MSC 710775
434.592.4999
titleix@liberty.edu
www.liberty.edu/titleix

### Contact Information for Deputy Coordinators

Deputy Coordinators assist the Vice President of Equity and Inclusion and the Executive Director/Title IX Coordinator by having direct oversight of the University's compliance with this Policy within their respective areas of the University.  Reports and Formal Complaints of Prohibited Conduct may be made directly to the Deputy Coordinators, who will forward them to Liberty's Executive Director/Title IX Coordinator.  The Deputy Coordinators are:

Steve Foster
Director of Employee Relations
Human Resources
434.592.3345
smfoster@liberty.edu

Erin Hagen
Associate Athletics Director and Senior Woman Administrator
Athletics Department
434.592.4951
ehagen1@liberty.edu

Denny McHaney
Executive Director of Disability Services
Office of Disability Accommodations Support ("ODAS")
434.582.2159
wdmchane@liberty.edu

## 3.    Scope of Policy/Jurisdiction

This Policy applies to conduct that occurs in the educational programs and activities of the University (including employment) when the University has substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurs.  Specifically, this Policy applies to conduct that occurs in the University's educational programs and activities, to conduct that takes place on the University's campus or on property owned or controlled by the University, to conduct that occurs at University-sponsored or –controlled events, and in buildings or on property owned or controlled by the University's recognized student organizations. The Respondent, as that term is defined below in Section 4.2 of this Policy, must be a member of the University community to trigger an investigation or resolution process that may result in sanctions under this Policy.

Moreover, this Policy should be interpreted broadly to also apply to the effects of off-campus and/or online (cyber) conduct that effectively deprives someone from equal access to the University's educational programs and activities on the basis of a legally-protected status. Accordingly, this Policy applies to conduct that occurs through the use of University-owned, University-controlled, and University-provided technology resources, networks, hardware and software, and platforms, regardless of location.   The University may also extend jurisdiction to off-campus and/or online (cyber) conduct when the Executive Director/Title IX Coordinator determines that the conduct affects a substantial University interest, even if the University does not have substantial control over the context in which the alleged Prohibited Conduct occurs.

A substantial University interest includes:

- Any action that constitutes a criminal offense, as defined by law. This includes, but is not limited to, single or repeat violations of any applicable local, state, or federal law;
- Any situation in which it is determined that the Respondent poses an immediate threat to the physical health or safety of a person;
- Any situation that significantly impinges on the rights, property, or achievements of a person or significantly breaches the peace and/or causes social disorder; and/or

- Any situation that is detrimental to the educational interests or mission of the University.

Regardless of where the conduct occurred, the University will appropriately evaluate and address all Reports and Formal Complaints to determine whether the conduct occurred within the scope and jurisdiction of this Policy and applicable laws. Note, however, that this Policy does not apply to conduct that occurs outside of the United States. Such Reports and Complaints will be dismissed under this Policy but will likely be referred to the University's Office of Community Life to be handled under another applicable University honor code. In such matters, the OEC will still be available to offer Supportive Measures and resources.

## 4. Definitions

### 4.1 Complainant

Complainant refers to a person who is reported to have experienced Prohibited Conduct. If the Complainant is deceased, the Executive Director/Title IX Coordinator may sign a Formal Complaint to proceed with the grievance procedures without the Complainant's presence, as permitted and to the extent possible under this Policy and the law. A Complainant is also a Party.

### 4.2 Respondent

Respondent refers to a person who has been accused of Prohibited Conduct. A Respondent is also a Party.

### 4.3 Third-Party

Third-Party refers to a person who is not a University student or employee (e.g., vendors, contractors, alumni, visitors, volunteers, College for a Weekend (CFAW) attendees, etc.). A Third-Party may be a reporting party, a Complainant, a Respondent, or a Witness for purposes of this Policy.

### 4.4 Witness

Witness refers to a person who may have information relevant to a Report or Formal Complaint of Prohibited Conduct, including a person who may have observed the acts in question, who may be able to provide contextual information, or who may have other related information. A Witness may be a student, an employee, or a Third-Party.

### 4.5 Formal Complaint

Formal Complaint refers to a document filed by a Complainant (or a parent or legal guardian with the legal right to act on behalf of the Complainant) or signed by the Executive

8

Director/Title IX Coordinator alleging Prohibited Conduct against a Respondent and requesting Liberty to formally investigate the allegations.

### 4.6    Report

Report refers to a complaint of Prohibited Conduct that may be filed by any person and that is not a Formal Complaint.

### 4.7    Days

Days refers to business days.

### 4.8    Supportive Measures

Non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or the Respondent before or after the filing of a Formal Complaint or where no Formal Complaint has been filed.  Supportive Measures range from academic support to administrative leave. Supportive Measures are designed to restore or preserve equal access to Liberty's education programs and activities, to protect the safety of all parties or Liberty's educational environment, or to deter sexual harassment. Because Supportive Measures are individualized services, and Supportive Measures involving employees may be different than Supportive Measures involving students, there is no inclusive list of Supportive Measures implemented in every case. Liberty maintains as confidential any Supportive Measures provided to the Complainant to the extent that maintaining such confidentiality would not impair Liberty's ability to provide the Supportive Measures. The Supportive Measures Resource is incorporated herein by reference.

## 5.    Prohibited Conduct

In determining whether reported conduct constitutes Prohibited Conduct, the University will consider the facts and circumstances of the incident, including the nature of the alleged misconduct and the context in which it occurred.  The following definitions and guidance provide more detail on the terms used to describe Prohibited Conduct under this Policy.

### 5.1    Discrimination

Discrimination is inequitable and unlawful treatment based on a person's legally-protected status (e.g., race, color, ancestry, religion, age, sex, national origin, pregnancy or childbirth, disability, or military veteran status) that excludes that person from participation in; denies that person the benefits of; treats that person differently; or otherwise adversely affects a term or condition of that person's employment, education, living environment, or participation in an educational program or activity of the University.

9

Discrimination can occur in the forms of (1) different treatment or (2) disparate impact, both forms of which violate this Policy. Absent direct evidence of discriminatory intent (e.g., remarks, written or oral statements, acts, or admissions revealing discriminatory motives), circumstantial evidence will be examined to determine whether a person received different treatment on the basis of a legally-protected status. If the Respondent states a legitimate, non-discriminatory reason for the different treatment, the OEC will consider whether the non-discriminatory reason stated is a pretext for discrimination rather than the actual reason for different treatment. In addition to different treatment, the facially-protected status-neutral criterion, policies, practices, or procedures of the University may have an unjustified, adverse effect on members of a protected status and thus constitute disparate impact Discrimination. Disparate impact Discrimination has not occurred unless there is an adverse effect on students of a particular legally-protected status. Even if there is an adverse effect on a legally-protected status, disparate impact Discrimination has not occurred if the criterion, policy, practice, or procedure is necessary to advance a legitimate, non-discriminatory educational goal of the University and there is not a comparably effective alternative criterion, policy, practice, or procedure that would achieve the goal with less adverse impact.

No otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any University program or activity. To comply with Section 504 and Title I of the ADA, the University must treat a qualified disabled student or a qualified disabled employee differently if, after an individualized analysis of that qualified disabled student's or qualified disabled employee's needs, the different treatment (i.e., reasonable accommodation) is determined to be necessary by ODAS (for students) or Human Resources (for employees) to provide the disabled individual with equal access to the University's programs and activities. For students to be protected by Section 504 and employees to be protected by Title I of the ADA, they must be determined by ODAS or Human Resources, respectively, to: (1) have a physical or mental impairment that substantially limits one or more major life activities, (2) have a record of such impairment, or (3) be regarded by the University as having such impairment. To be "qualified" under Section 504, disabled students must meet the academic and technical standards requisite for admission to, or participation in, the educational program or activity with or without reasonable accommodation. To be "qualified" under Title I of the ADA, disabled employees must perform the essential functions of the job with or without reasonable accommodation. The University is not required to, and does not, provide retroactive accommodations. Moreover, the University is not required to, and does not provide, accommodations that fundamentally alter its programs or activities, or that cause an undue burden on the University.

### 5.2   Harassment (Non-Sexual)

Harassment (Non-Sexual) is a form of discrimination in which unwelcome verbal, written, or physical conduct is directed toward a person on the basis of her or his legally-protected status other than sex by any member of the University community. Harassment (Non-Sexual) does not have to include intent to harm, be directed at a specific target, or involve

10

repeated incidents.  Examples of Harassment (Non-Sexual) include unwelcome derogatory slurs, jokes, statements and remarks, pictures, drawings, and other similar negative acts done on the basis of a legally-protected status other than sex.

Harassment (Non-Sexual) also violates this Policy when it creates a Hostile Environment.  A Hostile Environment is an environment that, through harassing conduct in any medium (e.g., oral, written, graphic, or physical) based on a person's protected status other than sex is sufficiently severe, persistent, or pervasive so as to interfere with or limit the ability of the person to participate in, or benefit from, a University program or activity, including employment.  Mere subjective offensiveness is not enough to create a hostile environment. The University must determine that a reasonable person (under similar circumstances and with a similar identity to the Complainant) would find the conduct harassing for there to be a hostile environment.  To determine whether a hostile environment exists, the University examines the following factors:

- The degree to which the conduct at issue affected one or more person's education or employment;
- The nature, scope, frequency, duration, and location of the incident(s) at issue;
- The identity, number, and relationships of persons involved;
- The perspective of a "reasonable person" in the same situation as the person subjected to the conduct at issue; and
- The nature and culture of higher education.

### 5.3     Sexual Harassment

Sexual Harassment, as a broader umbrella category, may take the form of Quid Pro Quo – Sexual Harassment, Unwelcome Conduct – Sexual Harassment, Sexual Assault, Domestic Violence, Dating Violence, Stalking, or Sexual Exploitation, as those terms are defined below. Sexual Harassment does not necessarily require evidence of an intent to harm by the Respondent; only that a reasonable person (under similar circumstances and with a similar identity to the Complainant) would find the conduct to be harassing.  Sexual Harassment is conduct on the basis of sex that takes one or more of the following forms:

### 5.3.1   Quid Pro Quo

Wherein an employee of the University conditions the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct.

***Note:***  *Liberty University's Statement of Professional Ethics (Faculty Handbook) prohibits the University's faculty members from having inappropriate and/or preferential relationships with University students apart from being a mentor, teacher, or role model.  Because inappropriate and/or preferential relationships often involve a power differential, such conduct may also constitute Sexual Harassment or other forms of Prohibited Conduct under this Policy.  When the conduct involves both a violation of the Statement of Professional Ethics (Faculty Handbook) and this Policy, the procedures under this Policy will apply.*

### 5.3.2   Unwelcome Conduct

Unwelcome verbal, nonverbal, written, electronic, or physical conduct on the basis of sex that is so severe, pervasive, and objectively offensive that it denies a person equal access to the University's educational programs or activities by creating an intimidating, hostile, or demeaning environment for employment, education, on-campus living, or participation in a University activity.  Examples of this type of sexual harassment may include: one or more instances of sexual assault; persistent unwelcome efforts to develop a romantic or sexual relationship; unwelcome sexual advances or requests for sexual favors; unwelcome commentary about an individual's body or sexual activities; repeated and unwelcome sexually-oriented teasing, joking, or flirting; and verbal abuse of a sexual nature.  Unwelcome conduct also includes acts of intimidation, bullying, aggression or hostility based on gender or gender-stereotyping, even if the acts do not involve conduct of a sexual nature.

### 5.3.3   Sexual Assault

Sexual Assault is any sexual act directed against another person, forcibly and/or against that person's will; or not forcibly or against the person's will where the victim is incapable of giving consent because of his or her temporary or permanent mental or physical incapacity (or because of his or her youth).  This offense includes the forcible rape of both males and females.  The following are the four types of forcible sex offenses and their definitions:

- Rape is the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim.
- Fondling is the touching of the private body parts of another person for the purpose of sexual gratification, forcibly and/or against that person's will; or, not forcibly or against the person's will where the victim is incapable of giving consent because of his/her youth or because of his/her temporary or permanent mental incapacity.
- Incest is non-forcible sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.
- Statutory Rape is non-forcible sexual intercourse with a person who is under the statutory age of consent.

### 5.3.4   Dating Violence

Dating Violence is violence committed by a person who is or has been in a social relationship of a romantic or intimate nature with the Complainant.  A relationship of a romantic or intimate nature means a relationship that is characterized by the expectation of affection or sexual involvement between those persons.  The existence of such a relationship will be determined based on consideration of the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.  Dating Violence includes, but is not limited to, sexual or physical abuse or threat of such abuse. Dating Violence can be a single event or a pattern of behavior that includes, but is not limited to, sexual or physical violence or abuse or the threat of such violence or abuse. Dating

Violence can include physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person. Such behaviors include those that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound another. Dating Violence does not include acts covered under the definition of Domestic Violence.

### 5.3.5   Domestic Violence

Domestic Violence is an act of violence committed: (i) by a current or former spouse or intimate partner of the victim; (ii) by one parent against another who share a child in common; (iii) by a person who is cohabitating with or has cohabitated with the other person as a spouse or intimate partner; (iv) a person similarly situated to a spouse of a victim under Virginia domestic or family violence laws; (v) or by any other person against another who is protected from that person's acts under Virginia domestic or family violence laws. Domestic Violence can be a single event or a pattern of behavior that includes, but is not limited to, sexual or physical abuse. Domestic Violence can include physical, sexual, emotional, economic, or psychological actions or threats of actions that influence another person. This includes behaviors that intimidate, manipulate, extort, demean, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound the victim.

### 5.3.6   Stalking

Stalking is a course of conduct directed at a specific person that would cause a reasonable person to fear for her or his safety or for the safety of others or suffer substantial emotional distress. In this context, "course of conduct" means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property; "reasonable person" means a reasonable person under similar circumstances and with similar identities to the victim; and "substantial emotional distress" means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling. Stalking also includes cyber-stalking, conducted using online, electronic, or digital technologies or communications (e.g., the Internet, social networks, blogs, cell phones, or text messages).

> **Note:** *Some of the examples of conduct listed in this section of the Policy may, even when done as a single act and not as part of a course of conduct, constitute another form of Prohibited Conduct, such as Sexual Exploitation.*

### 5.3.7   Sexual Exploitation

Sexual Exploitation occurs when a person takes non-consensual or abusive sexual advantage of another for anyone's advantage or benefit other than the person being exploited, and that conduct does not otherwise constitute Sexual Harassment under this Policy. Sexual Exploitation includes, but is not limited to:

13

- Sexual voyeurism.
- Invasion of sexual privacy.
- Taking pictures, video, audio recording of another in an sexual act, or in any other sexually-related activity when there is a reasonable expectation of privacy during the activity, without the consent of all involved in the activity, or exceeding the boundaries of consent (such as disseminating sexual pictures without the photographed person's consent), including the making or posting of revenge pornography.
- Engaging in a sexual activity with another person while knowingly infected with human immunodeficiency virus (HIV) or a sexually-transmitted disease (STD) or infection (STI), without informing the other person of the infection.
- Causing or attempting to cause the incapacitation of another person (through alcohol, drugs, or any other means) for the purpose of compromising that person's ability to give consent to sexual activity, or for the purpose of making that person vulnerable to non-consensual sexual activity.
- Misappropriation of another person's identity on apps, websites, or other venues designed for dating or sexual connections.
- Forcing a person to take an action against that person's will by threatening to show, post, or share information, video, audio, or an image that depicts the person's nudity or sexual activity.
- Knowingly soliciting a minor for sexual activity.
- Engaging in sex trafficking.
- Creation, possession, or dissemination of child pornography.

### 5.4     Other Civil Rights Offenses

In addition to the acts of Discrimination and Harassment that are prohibited above, the University also prohibits the following forms of Prohibited Conduct when the act is motivated by the Complainant's actual or perceived membership in a legally-protected class. Note, however, that such acts may also violate other University honor codes (e.g., The Liberty Way, Online Honor Code, and Graduate Honor Code) even when they are not motivated by a Complainant's actual or perceived membership in a legally-protected class.

#### 5.4.1   Threats/Harm

Threatening or causing physical harm, extreme verbal, emotional, or psychological abuse, or other conduct which threatens or endangers the health or safety of any person.

#### 5.4.2   Hazing

Hazing is any act likely to cause physical or psychological harm or social ostracism to any person within the University community, when related to admission, initiation, joining, continued membership, or any other group-affiliation activity.

14

### 5.4.3   Bullying

Bullying is repeated and/or severe aggressive behavior likely to intimidate or intentionally hurt, control, or diminish another person, physically and/or mentally.  Bullying includes oral or written derogatory name-calling, taunting, and threatening harm; social actions of spreading false rumors to damage a reputation, and causing extreme embarrassment; and physical actions of hitting, kicking, spitting, tripping, pushing down, rude hand gestures, and injuring or taking another's property.

### 5.4.4   Intimidation

Intimidation is actual or implied threats or acts that cause a protected class member, and that would cause a reasonable person (under similar circumstances and with a similar identity to the protected class member) to fear harm from another based on the protected class member's protected status(es).

### 5.4.5   Complicity

Complicity is any act taken with the purpose of aiding, facilitating, promoting, or encouraging the commission of Prohibited Conduct by another person.

### 5.5   Retaliation

Retaliation is any adverse action taken against a person because of their participation in a protected activity, including filing, assisting or providing information in connection with a Report or Formal Complaint of Prohibited Conduct.

Adverse action includes threats, intimidation, harassment, coercion, and/or conduct that would discourage a reasonable person (under similar circumstances and with a similar identity to the person) from participating in protected activity, and any other conduct that has a materially adverse effect on the working, academic, or other University-controlled environment of the person, or that hinders or prevents the person from effectively carrying out her or his University responsibilities.

Protected activities are actions that are undertaken pursuant to this Policy or the laws within the scope of this Policy.  Protected activities include, but are not limited to, filing a Report or Formal Complaint, serving as a witness, intervening in Prohibited Conduct as a bystander, opposing in a reasonable manner and consistent with University policy an act reasonably believed to constitute Prohibited Conduct, filing an external complaint about Prohibited Conduct, and any participation in an investigation or resolution process handled by the OEC. Making a lawful good faith Report or Formal Complaint, even if it turns out to be unfounded, is a protected activity.

Anyone within the scope of this Policy can be found to have engaged in Retaliation, not just a Respondent.  Reports and Formal Complaints of Retaliation necessarily require an inquiry

15

into the motive or intent behind the adverse action.  To ensure the integrity and fairness of the process, and to avoid any actual bias or conflicts of interest, as defined in Section 16.1 below, such Reports and Formal Complaints will be treated as separate and distinct matters from any other related matters involving the same Parties.

### 5.6    False Reporting

False Reporting is when a Report or Formal Complaint made under this Policy is later found to be intentionally false or made maliciously without regard for the truth, as well as when false or misleading testimony is provided by a Party or a Witness. False reporting is Prohibited Conduct under this Policy.  A Report or Formal Complaint made in good faith is not False Reporting, even if the University determines there is insufficient evidence that Prohibited Conduct occurred.

### 5.7    Non-Compliance with an Informal Resolution Agreement or a No-Contact Directive

Non-compliance with an informal resolution agreement or a no-contact directive is the failure to comply with the terms of an informal resolution agreement reached through the Informal Resolution process or the terms of a no-contact directive issued by the OEC.

## 6.    Consent and Incapacitation

The following definitions and guidance clarify key terms that inform investigations and resolutions of Sexual Harassment under this Policy.

### 6.1    Consent

Consent is the voluntary and freely given agreement, through words and/or actions, to participate in mutually agreed-upon sexual acts.  Consensual sexual activity happens when each person willingly affirms that they choose to participate.

In evaluating whether consent has been voluntary and freely given, the University will consider the presence of any force, threat of force, or coercion; whether the Complainant had the capacity to give consent; and whether the communication (through words and/or actions) between the Parties would be interpreted by a reasonable person (under similar circumstances and with a similar identity) as willingness to engage in a particular sexual act.

Consent cannot be obtained from another in situations involving physical force or a reasonable belief of the threat of physical force upon another person, when one person overcomes the physical limitations of another person, or when the other person is incapacitated.

Important points regarding consent include:

16

- Consent to one act does not constitute consent to another act;
- Consent on a prior occasion does not constitute consent on a subsequent occasion;
- Consent to an act with one person does not constitute consent to any act with another person;
- The existence of a prior or current sexual relationship does not, by itself, constitute consent to any sexual act; even in the context of a sexual relationship, there must be mutual consent to each sexual act;
- Consent can be affirmatively withdrawn or modified at any time, and sexual contact must cease immediately once consent is withdrawn through words and/or action; and
- Consent cannot be reasonably inferred from mere silence, mere passivity, mere lack of movement or mere lack of resistance.

Proof of consent or lack of consent is not a burden placed on either Party involved in an incident.  Rather, the University has the burden of proof and the burden of gathering evidence when determining Policy violations.

### 6.2    Incapacitation

Incapacitation is the inability, temporarily or permanently, to give consent because the person is mentally and/or physically helpless, either voluntarily or involuntarily, or the person is unconscious, asleep, or otherwise unaware that sexual activity is occurring.  In addition, a person is incapacitated whenever the person demonstrates that he or she is unaware of her or his location, present circumstances, or why or how he or she became engaged in sexual activity.

When alcohol is involved, incapacitation is a state beyond drunkenness or intoxication. When drug use is involved, incapacitation is a state beyond being under the influence, or impaired by the use, of the drug.  Alcohol and other drugs impact each person differently and determining whether a person is incapacitated requires an individualized determination.

The University does not expect members of its community to be medical experts in assessing incapacitation.  Persons should look for the common and obvious warning signs that show that a person may be incapacitated or approaching incapacitation.  A person's level of intoxication is not always demonstrated by objective signs; however, signs of intoxication or being under the influence of drugs include passing out, clumsiness, difficulty walking, poor judgment, difficulty concentrating, slurred speech, vomiting, combativeness, or emotional volatility.  A person who is incapacitated may not be able to understand some or all of the following questions: "Do you know where you are?"; "Do you know how you got here?"; "Do you know what is happening?"; and "Do you know whom you are with?"

A person's level of intoxication or drug impairment may change over a period of time based on a variety of factors, including the amount of substance intake, speed of intake, body mass, and metabolism.  It is especially important, therefore, that anyone engaging in sexual activity is aware of her or his own level of intoxication/drug impairment and the other person's level

17

of intoxication/drug impairment and capacity to give consent.  The use of alcohol or other drugs can lower inhibitions and create an atmosphere of confusion about whether consent is voluntarily and freely given.  If there is any doubt as to the level or extent of one's own intoxication or another person's intoxication, drug impairment, or incapacitation, the safest course of action is to forgo or immediately cease all sexual contact.

In evaluating consent in matters of reported incapacitation, the University asks two questions: (1) Did the Respondent know that the Complainant was incapacitated?; and, if not, (2) Should a sober, reasonable person in a similar set of circumstances as the Respondent have known that the Complainant was incapacitated? If the answer to either of these questions is "yes," there was no consent to participate in sexual activity.

## 7.    Confidentiality and Privacy

The University is committed to protecting the privacy of any person involved in the investigation and resolution of a Report or Formal Complaint under this Policy.  With respect to any Report or Formal Complaint under this Policy, the University will make reasonable efforts to protect the privacy of participants while balancing the need to gather information to assess the matter, take steps to eliminate the reported conduct, prevent its recurrence, and address its effects.

### 7.1    General Confidentiality

Confidentiality refers to the protections provided to information disclosed in legally-protected or privileged relationships under Virginia law, including licensed professional mental health counselors and licensed medical professionals.  Those confidential resources can engage in confidential communications under Virginia law when the information is disclosed within the scope of their providing professional services.  When a person shares information with a confidential resource (on-campus or in the community) in the course of a protected relationship, the confidential resource cannot disclose the information (including information about whether a person has received services) to anyone without the person's written permission or unless required or permitted by ethical or legal obligations which compel the professional to reveal such information.  For example, information may be disclosed when the person gives written consent for its disclosure, when there is an imminent concern that the person will likely cause serious physical harm to self or others, and when the information concerns conduct involving suspected abuse or neglect of a minor. A person's medical and counseling records are privileged and confidential documents.

### 7.2    Privacy

Privacy refers to the discretion that will be exercised by the University during any initial assessment, investigation, or resolution processes under this Policy regarding disclosures. Information related to a Report or Formal Complaint of Prohibited Conduct will be shared with a limited circle of University employees who need to know in order to assist in the initial

assessment, investigation, or resolution of the Report or Formal Complaint and any related issues.  University employees receive training in how to safeguard private information.

Information may be disclosed to Parties and other participants in an investigation or resolution process as necessary to facilitate the thoroughness and integrity of these processes, as well as to provide fairness to the Parties involved.  In all such occasions, the University will take into consideration the privacy of the Parties and other participants to the extent reasonably possible.

The privacy of student education records will be protected in accordance with FERPA and other relevant federal and Virginia laws.  The privacy of a person's medical and related records generally is protected by the Health Insurance Portability and Accountability Act ("HIPAA") and, where University treatment records are concerned, are protected by FERPA.

## 8.    Confidential Resources and Responsible Employees

It is important to understand the different responsibilities of University employees.  Every employee is designated as either a Confidential Resource or a Responsible Employee.  As a general matter, very few University employees are considered Confidential Resources.  No University employee designated as a Confidential Resource or a Responsible Employee is authorized or permitted to investigate or resolve a Report or Formal Complaint of, or to otherwise institute corrective measures for findings of, Prohibited Conduct other than the OEC and those specific employees listed in Section 2 of this Policy and their delegates, which may include a trained and qualified external investigator.

### 8.1    Confidential Resources

A Confidential Resource is any University employee who is a licensed medical, clinical or mental-health professional (e.g., physicians, nurses, physician's assistants, psychologists, psychiatrists, professional counselors, social workers and those employees performing services under their supervision), when acting in that professional role in the provision of services to a patient or client.  Any employee providing administrative, operational, and/or related support for such health care providers in their performance of such services is also a Confidential Resource.  Confidential Resources **will *not* disclose information** received from a patient or client about Prohibited Conduct without that person's permission, except as set forth in Section 8.1 and Section 8.2 of this Policy.  When employees who otherwise would be Confidential Resources receive information about suspected Prohibited Conduct outside of the provision of services to a patient or client, the Confidential Resource is encouraged to share that information with the OEC.

### 8.2    Responsible Employees

All Residential Faculty and Deans, Online Faculty and Deans, Athletic Coaches (NCAA & Club Sports), Residential Assistants, Residentials Directors, LUPD, Office of Community Life staff are Responsible Employees who **are *required* to report immediately** any information they

know about known or suspected Prohibited Conduct. Responsible Employees must immediately report all known information, including the identities of the Parties; the date, time and location; and other details about known or suspected Prohibited Conduct to the OEC. The OEC may share its Reports and Formal Complaints with LUPD and the Review Committee to ensure a coordinated institutional response. Consistent with applicable law, Responsible Employees may provide support and assistance to a Complainant, Witness, or Respondent; but they cannot promise confidentiality or withhold information about Prohibited Conduct.

Responsible Employees are not required to report information disclosed (1) at public awareness events (e.g., "Take Back the Night," candlelight vigils, protests, "survivor speak-outs," or other public forums in which students may disclose Prohibited Conduct (collectively, public awareness events)); or (2) during a person's participation as a subject in an Institutional Review Board-approved human subjects research protocol ("IRB Research"). The University may provide information about a person's rights under this Policy and about available University and community resources and support at public awareness events, however, and Institutional Review Boards may, in appropriate cases, require researchers to provide such information to subjects of IRB Research who report Prohibited Conduct.

### 8.3    Training of Responsible Employees

The University provides training to all Responsible Employees likely to witness or learn about Prohibited Conduct. Training for such employees includes practical information about how to prevent and identify Prohibited Conduct; the behaviors that may lead to and result in Prohibited Conduct; the attitudes of bystanders that may allow conduct to continue and bystander intervention methods; the potential for re-victimization by Respondents; appropriate methods for responding to a person who may have experienced Prohibited Conduct, including the use of non-judgmental language; the impact of trauma on victims; and the person(s) to whom such Prohibited Conduct must be reported. Such training will explain the Responsible Employees' reporting obligations, including what should be included in a Report or Formal Complaint and consequences for the failure to report, how to respond to requests for confidentiality, and the procedure for providing contact information for the University's Executive Director/Title IX Coordinator. The University will train Responsible Employees to inform persons of: the reporting obligations of Responsible Employees; their obligation to cooperate in resolution processes under this Policy; the option to request confidentiality and available confidential advocacy, counseling, and other support services; and the rights of a Complainant to file a Report or Formal Complaint with the University and/or to report a crime to LUPD or local law enforcement.

### 8.4    Clery Reporting

Pursuant to the Clery Act, the University includes anonymous statistics about certain offenses in its Annual Security Report and provides those statistics to the United States Department of Education in a manner that does not include any personally-identifying

information about persons involved in an incident.  The Clery Act also requires the University to issue timely warning notices to the University community about certain crimes that have been reported and may continue to pose a serious or continuing threat to campus safety (see Section 10 of this Policy).  Consistent with the Clery Act, the University withholds the names and other personally-identifying information of Complainants when issuing timely warning notices to the University community.

## 9.    Reporting Options and Resources

Many reporting options and resources are available, including counseling or assistance from a Confidential Resource, making a Report or Formal Complaint under this Policy, and/or making a report to law enforcement.  The University recognizes that deciding among these reporting options can be difficult and is a personal decision.  Complainants and Witnesses are encouraged to seek assistance from a Confidential Resource and to explore their potential reporting options and their available resources.

### 9.1    Emergency Resources and Law Enforcement

Emergency medical assistance and campus safety/law enforcement assistance are available both on- and off-campus.  Persons are encouraged to contact law enforcement and/or seek medical treatment as soon as possible following an incident that may pose a threat to safety or physical well-being and following a potential criminal offense.

To contact law enforcement:

Liberty University Police Department ("LUPD")
Green Hall, Southwest Corner
1971 University Blvd.
Lynchburg, VA 24515
434.592.3911 (Emergency)
434.592.7641 (Non-Emergency)

or, if off-campus:

Lynchburg Police Department
900 Court Street
Lynchburg, VA 24504
911 (Emergency)
434.455.6050 (Non-Emergency)

To access on-campus medical treatment, contact:

Liberty University Student Health Center (Operated by Central Virginia Family Physicians ("CVFP") Medical Group)
Commons 3, Lower Level

21

1606 Regents Parkway
Lynchburg, VA 24515
434.338.7774 (Office)

Local hospitals can be contacted at:

CENTRA Lynchburg General Hospital
1901 Tate Springs Rd.
Lynchburg, VA 24501
434.200.3000 (Switchboard)

CENTRA Virginia Baptist Hospital
3300 Rivermont Ave.
Lynchburg, VA 24503
434.200.4000 (Switchboard)

Salem VA Medical Center
1970 Roanoke Blvd.
Salem, VA 24153
540.982.2463
888.982.2463 (Switchboard)

To access crisis counseling and other community resources:

Veterans Crisis Line
1.800.273.8255

Sexual Assault Response Program ("SARP")
YWCA
Lynchburg Office
1900 Tate Springs Rd., Suite B
Lynchburg, VA 24501
434.947.7422 (Office)
888.947.7273 (24-Hour Confidential Hotline)

**9.2    Confidential Resources**

Students can access confidential resources on-campus as follows:

Liberty University Student Counseling Services
Green Hall, Suite 1830
1971 University Blvd.
Lynchburg, VA 24515
434.582.2651 (Office)
studentcounselingservices@liberty.edu

Liberty University Student Health Center (Operated by Central Virginia Family
Physicians ("CVFP") Medical Group)
Commons 3, Lower Level
1606 Regents Parkway
Lynchburg, VA 24515
434.338.7774 (Office)

Employees can access confidential resources off-campus through:

Employee Assistance Program (provided at no cost)
The Hartford Ability Assist ("EAP")
800.964.3577

### 9.3     Reporting Prohibited Conduct

Any person may report Prohibited Conduct (whether or not the person reporting is the
alleged victim).  Reports of Prohibited Conduct, including Discrimination and Harassment,
can be submitted or received through the following University channels: Liberty University
SpeakUP! Form; a Beacon Incident Report; Walk-In/Appointment with the Executive
Director/Title IX Coordinator, an Investigator, or a Deputy Coordinator; an email from a
Responsible Employee to the OEC, the Executive Director/Title IX Coordinator, an
Investigator, or a Deputy Coordinator on the Complainant's behalf; an email, letter, or
telephone call to the OEC, the Executive Director/Title IX Coordinator, an Investigator, or a
Deputy Coordinator.  Reports and Formal Complaints of Prohibited Conduct may be made at
any time (including non-business hours).  Reports of Prohibited Conduct can also be made
to LUPD or to local law enforcement at the contact information above, but such reports will
be handled pursuant to law enforcement procedures and not necessarily pursuant to this
Policy.

### 9.3.1   Anonymous Reporting

Anyone can make an anonymous Report of suspected Prohibited Conduct by submitting
information on this website: www.liberty.edu/studentaffairs/equityandcompliance/.  The
University's ability to respond to an anonymous Report may be limited by the nature of the
information submitted.

### 9.3.2   Amnesty

The University encourages Complainants, Witnesses, and other persons to report Prohibited
Conduct under this Policy and encourages Witnesses, Respondents, and other persons to
participate in an investigation or resolution process under this Policy.    Sometimes,
Complainants, Respondents, Witnesses and other persons are hesitant to offer assistance to
others, to report to University officials, or to participate in an investigation or resolution
process under this Policy because they fear that they themselves may be accused of policy

23

violations, such as underage drinking, at the time of the incident.  It is in the best interest of the University community that Prohibited Conduct and related criminal offenses are reported to the University, and that witnesses come forward to share what they know and cooperate with the University in its search for the truth.  To encourage reporting, testimony, and other participation in processes outlined in this Policy, the University maintains a policy of offering Complainants, Respondents, and Witnesses of Prohibited Conduct, as well as University students who offer help to others in need, amnesty from minor policy violations related to the incident.  Accordingly, the University will not pursue disciplinary action against Complainants, Respondents, or cooperating Witnesses for disclosure of personal consumption of alcohol or other drugs (underage or illegal) or immorality (e.g., premarital sex), where such disclosures are made in connection with a good faith Report or Formal Complaint of Prohibited Conduct, an investigation of Prohibited Conduct, or a process for resolving a Report or Formal Complaint of Prohibited Conduct, as long as the personal consumption or immorality did not place the health or safety of another person at risk.  In lieu of taking disciplinary action in such cases, the University may require the person receiving amnesty to participate in educational programming.  Amnesty is not automatically available from University policy violations related to the incident beyond the personal consumption of alcohol or other drugs and immorality, (e.g., vandalism, violence) which may have also occurred in connection with the incident.  Amnesty will never be given for Prohibited Conduct.

### 9.3.3   Timeframe for Reporting Not Limited

Complainants and other reporting persons are encouraged to report known or suspected Prohibited Conduct as soon as possible to maximize the University's ability to respond promptly and effectively.  Reports and Formal Complaints of Prohibited Conduct may be made at any time, without regard to how much time has elapsed since the incident(s) in question.

If the Respondent is no longer a student or employee of the University at the time of the Report or Formal Complaint, the University may be limited in its ability to take disciplinary action against the Respondent.  However, in such circumstances, the University will provide support to the Complainant and take steps to end the Prohibited Conduct, prevent its recurrence, and address its effects to the extent possible.  Upon request, the University will assist the Complainant in identifying and contacting law enforcement, other external enforcement agencies, and support resources.

## 10.   Review Committee and Timely Warning Notices

### 10.1   Review Committee

The Executive Director/Title IX Coordinator will convene a Review Committee meeting within seventy-two (72) hours of receipt of a Report or Formal Complaint of Sexual Violence,

as the term Sexual Violence is defined by Virginia law[2].  The Review Committee will be comprised of the Executive Director/Title IX Coordinator, or designee; a representative of LUPD; and a representative from the Division of Student Affairs.  In addition, the Review Committee may include a non-voting representative from Human Resources or the Office of the Provost if the Respondent is a University employee or faculty member, respectively, depending on the circumstances of the Report or Formal Complaint.  The Review Committee will operate in a manner that complies with applicable law.

The Review Committee operates pursuant to Va. Code § 23.1-806 and has access, under Virginia law, to certain otherwise confidential information, including law enforcement records and criminal history information, as provided in Va.  Code § 19.2-389 and § 19.2-389.1; health records, as provided in Va.  Code § 32.1- 127.1:03; University disciplinary, academic, and/or personnel records; and prior reports of Prohibited Conduct maintained by the Executive Director/Title IX Coordinator.  The Review Committee will have access to all available facts and circumstances and may seek additional information about the reported Sexual Violence through any other legally permissible means.

The Review Committee will determine whether the Report or Formal Complaint, and any other available information, presents a rational basis for concluding that there is a risk to the health or safety of the Complainant or any member of the University community that is an ongoing risk or continuing danger of future victimization of similar Sexual Violence.  If the Review Committee determines that there is a risk to the health or safety of the Complainant or any member of the University community, the LUPD representative will disclose the reported Sexual Violence together with personally identifiable information to the law enforcement agency that would be responsible for investigating the alleged incident.  The Complainant will be given notice of any disclosure to law enforcement.   The Review Committee will determine whether such a risk exists based upon the following factors as they may be known:

- Whether the identity of the Respondent is unknown;
- Whether the Respondent has been apprehended or is in the custody of law enforcement;
- Whether the reported risk has been addressed or otherwise contained;
- Whether the Respondent has prior arrests and their nature; is the subject of prior reports or complaints of Prohibited Conduct, especially Sexual Violence; or has any history of violent behavior;
- Whether the Respondent acted alone or has accomplices;
- Whether the report or complaint reveals a pattern of Prohibited Conduct or that similar acts of Sexual Violence have been set in motion (e.g., by the Respondent, by unknown person(s), by a particular group or organization, around a particular recurring event or activity, or at a particular location);

---

[2] Sexual Violence "means physical sexual acts perpetrated against a person's will or against a person incapable of giving consent." Va. Code § 23.1-900(A)(2020).

- Whether the Respondent has a history of failing to comply with any University No-Contact Directive, University protective measures, and/or judicial protective orders;
- Whether the Respondent has threatened to commit violence or engage in any form of Prohibited Conduct;
- Whether the Respondent was known to or had any relationship with the Complainant or whether the Complainant was a random victim of opportunity;
- Whether the reported Sexual Violence involved multiple Respondents;
- Whether the reported Sexual Violence involved physical force or violence;
- Whether the reported Sexual Violence involved any weapon;
- Whether the reported Sexual Violence was facilitated using "date-rape" drugs or whether other drugs or controlled substances were involved;
- Whether the reported Sexual Violence occurred while the Complainant was unconscious, physically helpless, or unaware that Prohibited Conduct was occurring; and
- Any other factor deemed relevant to making a determination of such risk.

If the reported Sexual Violence constitutes a felony violation of Va. Code § 18.2-61, *et al.*, the LUPD representative will notify the local Commonwealth's Attorney or other responsible prosecutor within twenty-four (24) hours and provide the prosecutor with the information received by the Review Committee without disclosing personally identifiable information. However, such personally identifiable information shall be disclosed if the Review Committee determines a risk to the health or safety of the Complainant or a member of the University community existed.

### 10.2   Timely Warning Notices

The University will issue timely warnings for reported Prohibited Conduct and other incidents that pose a substantial threat of bodily harm or danger to members of the University community that is an ongoing risk or continuing danger of future victimization of similar violations or crimes.  The University will ensure, to the extent possible, that a Complainant's name and other personally identifying information is not disclosed in a timely warning notice, while still providing enough information for members of the campus community to make decisions to address their own safety in light of the potential danger. The University will expeditiously determine whether such a risk exists based upon the following factors as they may be known:

- Whether the identity of the reported perpetrator is unknown;
- Whether the reported perpetrator has been apprehended or is in the custody of law enforcement;
- Whether the reported risk has been addressed or otherwise contained;
- Whether the reported perpetrator has prior arrests and their nature; is the subject of prior reports or complaints of conduct that is harmful to others; or has any history of violent behavior;
- Whether the reported perpetrator acted alone or has accomplices;

26

- Whether the report reveals a pattern of conduct that is harmful to others or that similar criminal acts have been set in motion (e.g., by the reported perpetrator, by unknown person(s), by a particular group or organization, around a particular recurring event or activity, or at a particular location);
- Whether the reported perpetrator has a history of failing to comply with any University No-Contact Directive, University protective measures, and/or judicial protective orders;
- Whether the reported perpetrator has threatened to commit violence or other conduct harmful to others;
- Whether the reported perpetrator was known to or had any relationship with the reported victim or whether the reported victim was a random victim of opportunity;
- Whether the reported incident involved multiple perpetrators;
- Whether the reported incident involved physical force or violence;
- Whether the reported incident involved any weapon;
- Whether the reported incident facilitated using "date-rape" drugs or whether other drugs or controlled substances were involved;
- Whether the reported incident occurred while the reported victim was unconscious, physically helpless, or unaware that the incident was occurring; and
- Any other factor deemed relevant to making a determination of such risk.

## 11.    General Procedural Considerations

The University is committed to providing a prompt, thorough, equitable, and impartial resolution of all Reports and Formal Complaints of violations of this Policy.  Reports and Formal Complaints of Prohibited Conduct will receive prompt attention once received by the OEC.  Such Reports and Formal Complaints may be resolved during the Initial Assessment stage or through the investigation and resolution processes (which may include the informal resolution process) set forth below.

### 11.1   Timeframe for Investigation and Resolution

The University will make every reasonable effort to ensure that the investigation and resolution processes related to a Formal Complaint of Prohibited Conduct occur in a timely and efficient manner.  The University's investigation and resolution of a Formal Complaint (not including an appeal, if applicable) will generally be completed within 60 to 90 days of the receipt of the Formal Complaint, absent extenuating circumstances.  Hearings, if any, typically take place within 20 days of the conclusion of the investigation, absent good cause for delay.  If a hearing has taken place, both the Complainant and the Respondent should expect to receive a Notice of Final Outcome within 20 days of the conclusion of the hearing.

Any Party may request an extension of any deadline by providing the Executive Director/Title IX Coordinator with a written request, which may be submitted via email, for an extension that includes the proposed duration of the extension being requested and the basis for the request.  The Executive Director/Title IX Coordinator may modify any deadlines contained in this Policy as necessary and for good cause; in such case, the Executive

Director/Title IX Coordinator will provide the Complainant and the Respondent with written notice of the modification and the reason for it.

Investigation and resolution processes will proceed according to the timeframes in this Policy to the extent possible during the summer, holidays, and other times when classes on the campus are not in session.  The OEC will work with the Parties to balance the need for promptness and the preference for in-person meetings in the investigation and resolution processes.  Timeframes for all investigation and resolution processes, as well as any modifications or extensions, apply equally to both the Complainant and the Respondent.

### 11.2    Cooperation and Participation of the Parties and Witnesses

#### 11.2.1  The Parties

Liberty University expects members of the University community to cooperate fully with the investigation and resolution processes outlined in this Policy.  In Formal Complaints where participation is invited or expected, Liberty will provide written notice of the date, time, location, participants, and purpose of all hearings, appeals (if any), investigative interviews, and other meetings at least five (5) days in advance. It is understood that there may be circumstances in which a Complainant or a Respondent wishes to limit his or her participation.  However, the University may move forward with its investigation and resolution processes without the participation of a Party or the Parties.   And while Complainants and Respondents may limit their cooperation, a Party delaying or failing to make oneself available for meetings with designated University administrators, or a Party providing information to designated University administrators that a Party knows to be untruthful, may be referred to the Office of Community Life ("OCL") or Human Resources (or both) for disciplinary action, depending on whether the Party is a student or an employee (or both) of the University.

If a Complainant or Respondent chooses not to answer any or all of the questions in an investigation or resolution process for any reason, the University will continue its process; and the University will issue findings and any sanctions, as appropriate, based on the evidence available.  The University will not draw any adverse inference from a Complainant's or a Respondent's decision not to participate in the investigation or resolution process under this Policy; however, the Complainant and the Respondent should be aware that declining to participate may impact the timing and resolution of the matter.  For example, one Party declining to provide testimony or other evidence may leave decision makers with a greater weight of the evidence in favor of the other Party.

#### 11.2.2  Witnesses

The University recognizes that a Witness may be reluctant to participate in the investigation and/or resolution processes. Nevertheless, any student or employee Witness who refuses to cooperate in an investigation or resolution process is subject to sanction.  Refusal to cooperate includes, but is not limited to, delaying or failing to timely respond to requests

from designated University administrators for information, delaying or failing to make oneself available for meetings with designated University administrators, and providing information to designated University administrators that the Witness knows to be untruthful.  If a Witness refuses to cooperate with the OEC, he or she may be referred to the OCL or Human Resources (or both) for disciplinary action, depending on whether the Respondent or Witness is a student or an employee (or both) of the University.  In addition, refusal to cooperate may result in a Student Affairs Hold being placed on a student's account.  Witnesses should also be aware that amnesty may be available if their reluctance to cooperate is due to involvement in certain misconduct (see Section 9.3.2).

### 11.3   Withholding Degree, Transcript Notation, and Expungement

While an investigation or resolution process under this Policy is pending, the University may defer or withhold the awarding of the Respondent's degree and/or place a notation on the Respondent's transcript in accordance with the law, this Policy, or any other University policy.  In compliance with Va. Code § 23.1-900, Liberty will include a prominent notation on the academic transcript of any student who has been suspended or permanently dismissed from the University or who withdraws from the University while under investigation for any Prohibited Conduct under this Policy that involves Sexual Violence, as defined by Virginia law. The notation will closely follow the form required by the statute.  Liberty will notify the student that any such suspension, dismissal, or withdrawal will be documented on the student's academic transcript.   A transcript notation made while an investigation or resolution process is pending is not a disciplinary sanction.   If a student is subsequently found not to have committed Prohibited Conduct, the notation will be promptly removed.

If the notation remains on the student's transcript due to his or her suspension or dismissal, the notation will be eligible for removal when the student: (i) has completed the term and any conditions of the suspension or dismissal, and (ii) has been determined by the University to be in good standing according to the University's code, rules, or set of standards governing such a determination.  Note, however, that removal of a transcript notation and/or return to good standing does not mean the student will be granted re-admission to the University.  The Expungement Process section below explains when and how students can get such notations removed.

Expungement Process:

When a student's transcript has been notated following suspension or dismissal from the University for Prohibited Conduct that involves Sexual Violence, there is an expungement process to have the notation removed.  The notation will not automatically be removed by the University.  The student must make a written request to the Executive Director/Title IX Coordinator to have the notation expunged and show good cause for expungement.  Good cause for expungement exists when: (i) the student has completed the term of and satisfied all sanctions and conditions related to the suspension or dismissal, (ii) three (3) calendar years have passed since the date on which the resolution process was finalized (as evidenced by the date of the Notice of Final Outcome), and (iii) there have been no additional

substantive conduct issues, such as convictions or violations of honor codes at other schools, since the suspension or dismissal.  Alternatively, if the student is re-admitted to the University following suspension or dismissal, re-admission will be considered evidence of good cause for expungement of the notation regardless of whether requirements (i) through (iii) have been met.  Whether good cause for expungement exists will be evaluated by the Executive Director/Title IX Coordinator on a case-by-case basis.

### 11.4   Advisor of Choice

Throughout the investigation and resolution processes, each Party has the right to consult with an advisor of his or her choosing.  The advisor may be any person, including an attorney, who is not otherwise a Party or Witness involved in the investigation and resolution of the matter.  When a Report or Formal Complaint is made, the Respondent and the Complainant may be accompanied by an advisor of their choice to any meeting or resolution process that is part of the Formal Resolution or Informal Resolution processes. Any restrictions on the participation of advisors apply equally to Respondents and Complainants.

Participation of Advisors:

While the advisor may provide advice and support to his or her Party at any meeting or resolution process, the advisor may not speak on behalf of any Party or otherwise participate in[3], or in any manner delay, disrupt, or interfere with, meetings or processes conducted under this Policy.  Generally, the OEC and its Executive Director/Title IX Coordinator will communicate directly with the Complainant or Respondent, and any communications with an advisor may occur only after a FERPA waiver has been executed giving the University the Party's consent to discuss the matter with the advisor.  An advisor should plan to make himself or herself reasonably available, as the University will not unduly delay the scheduling of meetings or proceedings based on an advisor's (un)availability.  An advisor may be asked to confer with a University administrator in advance of any meetings or processes to ensure that the advisor understands the expectations of her or his role, privacy considerations, other considerations (such as the standard of review, evidentiary considerations, etc.), and appropriate decorum (i.e., advisors must follow the University's rules, and advisors will not be allowed to be disrespectful; badger University employees, Parties, or Witnesses; nor otherwise exhibit inappropriate decorum, as determined by the University).

### 11.5   Civil Rights Investigators

The University's Civil Rights Investigators ("Investigators") are neutral fact-finders who have received appropriate training and are designated by the University's Executive Director/Title IX Coordinator to investigate Reports and Formal Complaints of Prohibited Conduct.  The University's Investigators receive annual training on issues related to the Prohibited Conduct in this Policy and on how to conduct investigation and resolution

---

[3] An advisor's role and participation at a Hearing conducted under Section 13 is unique in that advisors have an opportunity to actively participate in a Hearing. See Section 13 for more information.

processes that are fair, impartial, and thorough and that provide Parties with sufficient notice, a meaningful opportunity to be heard, and protect the safety of the greater University community while also promoting the accountability of its members.  These training materials are available upon written request.  The Deputy Coordinators listed in Section 2 above may also serve as Investigators, especially in matters involving Respondents who are employees of the University.

The Executive Director/Title IX Coordinator may also designate qualified, trained external investigators, or other trained University employees outside of the OEC, to investigate a Report or Formal Complaint of Prohibited Conduct under this Policy.

### 11.6    Standard of Review

The standard of review used to determine whether there is sufficient evidence to support a finding that the Respondent is responsible for violating this Policy is the "preponderance of the evidence" standard.  A preponderance of evidence means that, based on all of the relevant evidence, as well as all reasonable inferences from the evidence, the greater weight of the evidence indicates that the Respondent violated this Policy.  To be found responsible for violating this Policy, each element of the alleged Prohibited Conduct must be satisfied by a preponderance of the evidence.  The determination of whether the Respondent violated this Policy is made by the Hearing Officer (for allegations of Sexual Harassment and allegations of other types of Prohibited Conduct arising out of the same incident or facts that may be consolidated with allegations of Sexual Harassment to also be decided by the Hearing Officer) or the Investigator (for all other allegations), as outlined below.

### 11.7    Record-Keeping Requirement

In accordance with federal law, the University maintains all records created pursuant to this Policy for a period of at least seven (7) years from the date a matter was resolved.

## 12.    Procedures for Resolving Prohibited Conduct

The procedures in this section apply generally (unless otherwise specified) to all Reports and Formal Complaints of all forms of Prohibited Conduct.  When Reports and Formal Complaints of Prohibited Conduct are received, there will be an Initial Assessment (see Section 12.1 below).  If a Formal Complaint has not already been made, the Complainant may make one to initiate the Informal Resolution and/or Formal Resolution processes under this Policy.  Disciplinary sanctions cannot be imposed without a Formal Resolution process (Investigation or Hearing).  More information about these processes is provided below.

### 12.1    Initial Assessment of Reports and Formal Complaints

Following the receipt of a Report or Formal Complaint of Prohibited Conduct, the Executive Director/Title IX Coordinator will conduct an Initial Assessment.  For all Reports and Formal Complaints, the Executive Director/Title IX Coordinator will first address all immediate

physical health, safety, and/or emotional well-being needs and concerns of the Complainant, as well as any possible threats to campus safety. The Executive Director/Title IX Coordinator will then follow the steps in this section below, as appropriate.

The Executive Director/Title IX Coordinator will also refer the Report or Formal Complaint to LUPD to enter it into the University's daily crime log, if such entry is required by the Clery Act; assess whether a Review Committee must be convened, which Review Committee also assesses whether a Timely Warning Notice and/or other notifications are required by law; assess any patterns of conduct, including whether there is a pattern or level of conduct that might impact campus safety; determine the age of the Complainant and, if the Complainant is a minor, whether any notifications are required by law (including Virginia's law that requires mandatory reporting of known and suspected child abuse and neglect); make other assessments related to legal compliance obligations; discuss with the Complainant reporting options, resources, and Supportive Measures (including an offer to assist with using them).

The Executive Director/Title IX Coordinator may also gather information and other evidence about the alleged Prohibited Conduct during the Initial Assessment.

### 12.1.1 Contacting the Complainant

After receiving a Report or Formal Complaint, the Executive Director/Title IX Coordinator will promptly contact the Complainant to assess the Complainant's physical health, safety, and/or emotional well-being needs and concerns, and address those needs and concerns. As appropriate, the following additional information will be provided to the Complainant (via telephone, email, or in-person), regardless of the Complainant's express desire (or lack thereof) to participate in the process:

- Provide the Complainant with the Supportive Measures form;
- An invitation to schedule an Intake or informal meeting;
- An explanation of the process for filing a Formal Complaint
- How to file a report with law enforcement
- Notify the Complainant of their right to contact law enforcement and to seek a civil protection order;
- Notify the Complainant of their right to seek medical treatment;
- Notify the Complainant of the importance of preservation of evidence;
- Provide the Complainant with written information about on-campus and off-campus resources;
- Provide the Complainant with an explanation of procedural options such as Informal Resolution or an investigation under this Policy;
- Provide information about Confidential Resources at Liberty and off-campus;
- Provide information about the Amnesty provision under this Policy;
- Notify the Complainant of their right to be accompanied by an advisor of their choice, who may or may not be an attorney, to any meetings; and
- Notice that Retaliation is strictly prohibited.

32

### 12.1.2 Complainant Intake

At the Complainant's request, before or after filing a Formal Complaint, the Investigator will conduct an Intake meeting with the Complainant.  During the Intake, the Investigator and the Complainant will again discuss the availability of Supportive Measures, as well as the rights and options for engaging in investigation and resolution processes under this Policy, as well as for pursuing criminal charges and/or civil legal action.  The Investigator will obtain as much information as possible during the Intake about the alleged incident, including witness names and any available evidence.  All Intake meetings are audio recorded and will be transcribed if a Complainant moves forward with a Formal Complaint.   The Complainant Intake may occur as part of an Initial Assessment or as the first step after the filing of a Formal Complaint.

### 12.1.3 Campus Safety Assessment

To protect the safety of the campus community, the OEC (sometimes in conjunction with other University offices, such as LUPD) will evaluate all Reports and Formal Complaints of Prohibited Conduct for allegations of violence, threats, use of force, use of weapons, serial predation and other campus safety concerns that need to be addressed.   To determine whether an allegation of Prohibited Conduct poses a risk to campus safety, the University will weigh the following factors:

- The seriousness of the Prohibited Conduct (including, but not limited to, whether the Prohibited Conduct was perpetrated with a weapon or involved multiple victims or vulnerable victims);
- The increased risk that the alleged perpetrator will commit additional acts of Prohibited Conduct, such as whether there have been other reports or complaints against the alleged perpetrator, whether the alleged perpetrator has a history of arrests or records from a prior school indicating a history of Prohibited Conduct or a history of violence, whether the alleged perpetrator threatened further Prohibited Conduct or threatened violence against the victim or others, or whether the Prohibited Conduct was committed by multiple perpetrators;
- Whether the information reveals a pattern of predation at a given location or by a particular group or person;
- Whether the victim is a minor; and
- Whether the University possesses other means to obtain relevant evidence of the Prohibited Conduct (e.g., security cameras or security personnel, physical evidence).

The results of the Campus Safety Assessment will be used by the University to complete its Initial Assessment and will be part of the evaluation of known circumstances that may inform the Executive Director/Title IX Coordinator's decision to sign a Formal Complaint if the Complainant declines his or her opportunity to do so.

### 12.1.4 Emergency Restrictions of Respondent

33

Based on the available evidence, the University has the discretion to restrict a Respondent entirely or partially from its campus or education programs and activities on an emergency basis. Based on the results of the Campus Safety Assessment, and an individualized safety and risk analysis, the University may determine that the Respondent poses an immediate threat to the physical health or safety of the Complainant, other individuals, and/or the campus community.

This determination will be made by a three-person panel, which panel must include the Executive Director/Title IX Coordinator. The other two (2) representative may be from LUPD, a Deputy Coordinator, a University employee from another student affairs division, or another University employee appointed by the Executive Director/Title IX Coordinator.

If the panel determines that Emergency Restriction is necessary, the Executive Director/Title IX Coordinator will notify the Respondent of the determination in writing of the Emergency Restriction and his or her right to challenge the determination. The Respondent will be given the opportunity to meet with the Executive Director/Title IX Coordinator prior to Emergency Restriction being imposed (if possible), or as soon thereafter as possible, to show cause for why the Emergency Restriction should not be implemented or should be modified. The meeting is not a hearing on the merits of the allegations. The meeting is solely to determine whether Emergency Restriction is appropriate and narrowly-tailored to prevent harm. After considering the Respondent's objection, the panel will review the evidence, and make a determination. The determination is subject to an ongoing re-evaluation based on available evidence. The determination may be modified or made permanent, as deemed appropriate.

### 12.1.5  Request for Limited Action

The Complainant has the right to decline to respond to communications from the OEC; request that the University not pursue any form of investigation or resolution under this Policy; limit his or her participation in the process; or request Supportive Measures and decline to file a Formal Complaint. If the Complainant declines to file a Formal Complaint, the University will close the matter, unless the Executive Director/Title IX Coordinator determines that not proceeding against a Respondent would clearly be unreasonable in light of the known circumstances. In such instances, the Executive Director/Title IX Coordinator will sign a Formal Complaint. When a Formal Complaint is signed by the Executive Director/Title IX Coordinator, the Complainant will receive notifications of the resolutions process and will be treated as a Party throughout the grievance process. In such cases, the Complainant will be encouraged, but not required, to participate. In short, the OEC will try to respect the Complainant's wishes with regard to options to the extent possible.

### 12.2    Formal Complaints

When a Formal Complaint is received, the Executive Director/Title IX Coordinator will promptly perform a limited review to assess its sufficiency, evaluate for grounds that would justify mandatory or discretionary dismissal (see Section 12.2.3 below), and, if necessary, clarify with the Complainant any information that is unclear. The requirements for a Formal

Complaint are explained below.  The Executive Director/Title IX Coordinator will review the Formal Complaint to ensure that the Complainant wishes to proceed with Informal Resolution and/or Formal Resolution processes, and, if necessary, contact the Complainant to confirm.  The limited review of a Formal Complaint typically takes one (1) to five (5) days.

### 12.2.1 Filing a Formal Complaint

As defined above, a Formal Complaint is a document filed by the Complainant (or by the parent or legal guardian of a Complainant who has the legal right to "act on behalf of" the Complainant) or signed by the Executive Director/Title IX Coordinator alleging Prohibited Conduct against a Respondent and requesting that the University investigate the allegation(s).  The Formal Complaint must also be signed by the Complainant (or by the parent or legal guardian of a Complainant who has the legal right to "act on behalf of" the Complainant), which signature can either be a physical signature or a digital e-signature. Complainants may complete the Formal Complaint Form and submit it to the Executive Director/Title IX Coordinator, the OEC, or any one of the Responsible Employees listed in Section 2 of this Policy.  In the alternative, Complainants may submit a written statement in their own words to the Executive Director/Title IX Coordinator, the OEC, or any one of the Responsible Employees listed in Section 2 of this Policy providing sufficient information for the University to investigate the allegations contained therein (including, but not limited to, the name of the Complainant; the name of the alleged Respondent, if known; and the date, location, and nature of the alleged Prohibited Conduct).  At the time of the filing of a Formal Complaint, the Complainant must be participating in or attempting to participate in a Liberty educational program or activity.  A Formal Complaint may be filed by using the reporting options outlined in Section 9.3 of this Policy, or by contacting designated University employees using the contact information in Section 2 of this Policy. When the Executive Director/Title IX Coordinator signs a Formal Complaint, the Executive Director/Title IX Coordinator is not a Complainant or otherwise a Party.  Rather, the Executive Director/Title IX Coordinator is acting on behalf of the University.

Filing a Formal Complaint with the OEC triggers the University's Informal Resolution and/or Formal Resolution processes under this Policy.  Once a Formal Complaint has been filed, and after the Initial Assessment, the University will initiate (1) an Informal Resolution (if appropriate), (2) an Investigation (with or without a Hearing, depending on the type of Prohibited Conduct), or (3) dismiss the Formal Complaint consistent with Section 12.2.3 of this Policy.  The University will not initiate an Informal Resolution or a Formal Resolution unless a completed and signed Formal Complaint is filed by the Complainant requesting that such resolution occur, or unless the Executive Director/Title IX Coordinator signs a Formal Complaint.

### 12.2.2 Notice of Formal Complaint to Parties

Following receipt of a Formal Complaint, the OEC will provide formal written notice to all known parties at least five (5) days in advance of any meeting or interview, including the Respondent's Intake.  The written notice will contain the following information:

- Details of the allegations of Prohibited Conduct, including the identities of the parties involved, if known, the date and location of the incident, if known, and the conduct allegedly constituting Prohibited Conduct;
- A statement that the Respondent is presumed not responsible for the alleged Prohibited Conduct and that a determination of responsibility will be made at the conclusion of the grievance process;
- An explanation of the University's Formal Resolution process, as outlined in this Policy, including a summary of possible sanctions in the event that the Respondent is found responsible for the alleged Prohibited Conduct at the conclusion of the Formal Resolution Process;
- A description of the range of Supportive Measures available to both Complainants and Respondents;
- An explanation of the University's Informal Resolution process, as established by this Policy, including the requirements of the Informal Resolution process under Section 12.3 and any consequences flowing from participation in Informal Resolution;
- A statement that the Parties may have an advisor of their choice, and that the advisor may be, but is not required to be, an attorney;
- A statement that the Parties and their chosen advisors may inspect and review evidence gathered during the Investigation that is directly related to the allegations raised in the Formal Complaint; and
- A statement that knowingly making false statements or knowingly submitting false information during the investigations and resolutions processes is strictly prohibited and constitutes Prohibited Conduct under Section 5.6 of this Policy.

If, during the course of the investigation, the University discovers new evidence that causes it to decide to investigate new allegations of Prohibited Conduct or involve new Parties that were not included in the initial written Notice of Formal Complaint, the University will provide updated notice of the additional allegations to all known Parties.

### 12.2.3 Mandatory and Discretionary Dismissal of Reports and Formal Complaints

The University <u>must</u> dismiss a Report or Formal Complaint of Prohibited Conduct if it is determined that:

- The alleged conduct would not constitute Prohibited Conduct even if proved;
- The conduct did not occur in an educational program or activity controlled by the University and/or the University does not have control over the Respondent;
- The conduct did not occur in the United States or against a person in the United states; or
- At the time of filing a Formal Complaint, the Complainant is not participating in or attempting to participate in an educational program or activity of the University.

36

The University <u>may</u> dismiss a Report or Formal Complaint of Prohibited Conduct if:

- The Complainant provides written notice that he or she would like to withdraw the Formal Complaint or any allegations therein;
- The Respondent is no longer enrolled or employed by the University; or
- Specific circumstances prevent the University from gathering evidence sufficient to reach a determination as to the Formal Complaint or allegations therein.

Upon any dismissal, the University will promptly send written notice of the dismissal and the reason(s) for the dismissal simultaneously to the Complainant and the Respondent and notice the Respondent and Complainant of their right to appeal the dismissal (including how to submit an appeal), if applicable.  A dismissal of a Formal Complaint of Sexual Harassment, as defined in this Policy, may be appealed by either the Complainant or the Respondent. See Section 16 for the Appeal process.

### 12.2.4 No Anonymity for Formal Complaints

When a Complainant files a Formal Complaint, the Complainant cannot remain anonymous or prevent the Complainant's identity from being disclosed to the Respondent. If the Complainant files a Formal Complaint and insists on remaining anonymous, the Complainant may withdraw the Formal Complaint or such anonymity may prevent the University from gathering sufficient evident to investigate the allegations and, thus, the Formal Complaint may be dismissed under Section 12.2.3 of the Policy.

At intake, a Complainant may request that personally-identifying information not be shared with the Respondent, that no investigation or resolution process be pursued, and/or that no disciplinary action be taken.    The Executive Director/Title IX Coordinator will evaluate requests not to proceed in light of the duty to ensure the safety of the campus community, and to comply with federal and Virginia law.  When evaluating a request not to proceed, the Executive Director/Title IX Coordinator will consider (1) the effect that non-participation by the Complainant may have on the availability of evidence and the University's ability to pursue an investigation or resolution fairly and effectively, and (2) the results of the Campus Safety Assessment and whether there is a compelling health and/or safety risk to the campus community that must be addressed.   These factors will inform the Executive Director/Title IX Coordinator's decision to sign a Formal Complaint when the Complainant declines to do so.  When a Formal Complaint is signed by the Executive Director/Title IX Coordinator, the Complainant will receive regular notifications of the grievance process and will be treated as a Party throughout the investigation and resolution processes.

### 12.2.5 Respondent Intake

During the Respondent's Intake, the Investigator will discuss the allegation(s) of Prohibited Conduct.  If a Formal Complaint has been filed and the Intake is also the initial interview of the Respondent, at least seven (7) days before the Intake/initial interview, the Executive Director/Title IX Coordinator will provide a written Notice of Formal Complaint to the

Respondent, as described in Section 12.2.2 of this Policy. The Investigator and the Respondent will discuss the Respondent's rights, as well as available University resources for support, including interim Supportive Measures, while the Investigation is pending. Liberty maintains as confidential any Supportive Measures provided to the Respondent to the extent that maintaining such confidentiality would not impair Liberty's ability to provide the Supportive Measure. No disciplinary sanctions will be imposed prior to determination of responsible at the conclusion of the Formal Resolution process. The Respondent will be given a meaningful opportunity to respond to the allegations and offer evidence and/or potential witnesses. As previously stated in in this Policy, while the Respondent is expected to attend the Respondent Intake meeting and receive information, the Respondent is not required to make a statement or otherwise provide information relevant to the investigation. However, the investigation will continue, and a determination of responsibility made in accordance with the Formal Resolution process unless the Formal Complaint is dismissed prior to a determination. In Formal Complaints where participation is invited or expected, Liberty will provide written notice of the date, time, location, participants, and purpose of all hearings, investigative interviews, or other meetings at least seven (7) days prior to the scheduled hearing, interview or other meeting.

### 12.2.6 Discretion When Discussing the Allegations

The University will not restrict the ability of the Complainant or the Respondent to discuss the allegations made in the Formal Complaint with others, including their advisors of choice. However, the Complainant and Respondent are both advised to use wise discretion when discussing sensitive information, especially in public forums. Discussing the allegations with others may hinder the University's ability to conduct thorough and equitable investigation and resolution processes or, in certain circumstances, violate other University honor codes.

### 12.3    Informal Resolution

The Informal Resolution process seeks to effectively resolve allegations of Prohibited Conduct at the earliest stage possible in a less adversarial manner that gives the Parties more control over the resolution of the Formal Complaint. The University may facilitate an Informal Resolution at any time prior to a determination of whether the Respondent is responsible for the alleged Prohibited Conduct. Informal Resolution may include mediation, restorative conferences, targeted educational and training programs, or mutually-agreed-upon disciplinary sanctions. There may, or may not, be an admission of responsibility for the Prohibited Conduct during the Informal Resolution process.

### 12.3.1 Eligibility for Informal Resolution and Other Considerations

Informal Resolution is only appropriate if (1) a Formal Complaint has been filed and (2) the Complainant and the Respondent both voluntarily consent in writing to participate in the Informal Resolution process. Formal Complaints by a Complainant-student alleging any form of Sexual Harassment by a University employee are not eligible for Informal Resolution.

The Complainant and the Respondent each has the right to withdraw from the Informal Resolution process at any time prior to agreeing to a resolution and resume the Formal Resolution process with respect to the Formal Complaint.  Furthermore, the University may, when it deems appropriate, terminate or decline to initiate Informal Resolution and instead proceed with the Formal Resolution process.  In cases where the Formal Resolution process is resumed, statements, disclosures, or admissions made by Complainants, Respondents, or Witnesses in the course of the Informal Resolution process may be considered in accordance with the evidentiary requirements of the Formal Resolution process.  Reaching a resolution concludes the Informal Resolution process and precludes resumption of the Formal Resolution process for all allegations in the Complaint.

Informal resolution may not be selected for less than all of the Prohibited Conduct alleged in the Formal Complaint (for example, the Parties may not choose to resolve a claim of Sexual Assault according to the Formal Resolution process but use the Informal Resolution process for all other allegations).   If the Parties agree to Informal Resolution (and Informal Resolution is appropriate for all allegations of Prohibited Conduct), then all of the allegations must be resolved according to the Informal Resolution process, unless the Informal Resolution process is terminated by Liberty, or the Complainant or the Respondent withdraws from the Informal Resolution process prior to agreeing to resolution.  In those instances, the Formal Resolution process will be resumed for all allegations in the Formal Complaint.

### 12.3.2 Procedural Requirements of Informal Resolutions

When the Informal Resolution Process is initiated, the Executive Director/Title IX Coordinator will appoint a Mediator, who may be an Investigator not assigned to handle the Formal Resolution process or another neutral party with adequate training, to oversee the process.  The Mediator will attempt to facilitate a resolution of the Formal Complaint.

The Mediator will provide concurrent written notice to the Complainant and the Respondent, which includes the allegations; the requirements of the Informal Resolution process; and any consequences resulting from participating in the Informal Resolution process.  The notice will also set forth the date, time, and location of the Informal Resolution Conference ("IRC").  If only some of the allegations of Prohibited Conduct in the Formal Complaint justify continuing to Informal Resolution because other allegations in the Formal Complaint are being dismissed, the Mediator will also specify in the notice which part of the alleged Prohibited Conduct will be the subject of the Informal Resolution process along with notice that all other allegations are dismissed in accordance with Formal Complaint dismissals under this Policy.

Any party may challenge the appointment of the Mediator by submitting a written objection to the Executive Director/Title IX Coordinator within three (3) days of receipt of the notice of the Informal Resolution process.  Such objection must state the specific reason(s) for the objection.  Failure to submit a timely and proper objection will constitute a waiver of any right of objection.  The Executive Director/Title IX Coordinator will evaluate the objection

and determine whether to assign a different Mediator.  Any substitution of the Mediator will be provided in writing to both parties prior to the date of the IRC.

The Complainant and the Respondent are not required to appear together in-person at the same IRC but attendance at IRCs is required.  If either Party fails to appear at an IRC after receiving proper notice, the Mediator may, in his or her discretion, either reschedule the IRC, or terminate the Informal Resolution process if one or both Parties are not participating in the process in good faith. If the Informal Resolution process is terminated, both parties will be notified in writing of the termination and notified that the Formal Complaint will now be handled under the Formal Resolution process.  Liberty strives to complete the Informal Resolution process within 60 days but extensions for good cause may be granted. If an extension is granted, both parties will be notified in writing of the extension and the reason it was granted.

### 12.3.3 Reaching Informal Resolution

The Complainant and the Respondent may not contact each other outside of the Informal Resolution process, even to discuss the process.  The Complainant and Respondent may engage one another in the presence of the Mediator or communicate through the Mediator their feelings and perceptions regarding the alleged incident and the impact of the alleged incident and relay their wishes and expectations regarding the future.  Both parties must participate in good faith. If an agreement is reached, and the Mediator finds that the agreement is appropriate under the circumstances, the Mediator will prepare in writing the terms of the resolution agreement and provide both parties a copy for their review.  Once the resolution agreement is signed by both the Complainant and Respondent, the Formal Complaint will be closed.  Any failure to comply with the resolution agreement is itself Prohibited Conduct under this Policy which can be the subject of a Complaint by Executive Director/Title IX Coordinator or a party to the resolution agreement.

### 12.4    Formal Resolution Process – Investigation

An investigation is a Formal Resolution process by which an Investigator gathers evidence relevant to determining whether the Respondent is responsible for the Prohibited Conduct alleged in the Formal Complaint.  During an Investigation, the Investigator will conduct intake meetings with the Complainant and Respondent, conduct meetings with Witnesses, collect and preserve all directly-related and relevant evidence, including all documentary evidence such as emails, text messages, photographs, audio recordings, video, etc. The Respondent is presumed not responsible for the alleged Prohibited Conduct at all stages of the investigation unless and until a determination of responsibility is made at the conclusion of the appropriate Formal Resolution process.

### 12.4.1 Gathering and Submitting Evidence

The University will not restrict the Complainant and Respondent's ability to gather and present relevant and/or directly related evidence.  The Parties are given an equal and fair

opportunity to present Witnesses, including fact and expert Witnesses and other inculpatory and exculpatory evidence. The University has the burden of gathering sufficient evidence to reach a determination in the matter.

### 12.4.2 Prior Sexual History

Questions and evidence related to the Complainant's or Respondent's prior sexual behavior and/or sexual predisposition are not relevant, unless such evidence and questions are offered to the Investigator or the Hearing Officer (during a Live Hearing) to prove:

- someone other than the Respondent committed the conduct alleged by the Complainant,
- the Respondent committed the conduct alleged by the Complainant because of a pattern in substantial conformity with Respondent's prior sexual behavior, or
- consent to the conduct alleged by the Complainant.

### 12.4.3 Prior Disciplinary History

Evidence related to the prior disciplinary history of the Parties is generally not used in determining whether Prohibited Conduct has occurred and will only be considered under limited circumstances. For example, the Respondent's prior disciplinary history may be deemed relevant and considered if the information provides evidence of a pattern of misconduct by the Respondent in substantial conformity with the present allegation of Prohibited Conduct. In addition, the Complainant's prior disciplinary history may be deemed relevant if he or she has been found to have been responsible for prior False Reporting. The Executive Director/Title IX Coordinator, in conjunction with the assigned Investigator or the Hearing Officer (during a Live Hearing), will determine whether the limited circumstances for relevance of prior disciplinary history are present. Both Parties will be informed if evidence of disciplinary history will be used in determining whether Prohibited Conduct has occurred. If the Respondent is determined to be responsible for a violation of this Policy, the Respondent's prior disciplinary history (and other relevant and available information) will be taken into consideration when determining which, if any, sanctions are appropriate.

### 12.4.4 Privileged Information and Medical Records

The Investigator will not allow submission of or rely on questions or evidence that constitute, or seek disclosure of, information protected by a legally-recognized privilege, unless the holder of such privilege has voluntarily waived the privilege. In addition, the Investigator cannot access, consider, disclose, or otherwise use a party's records that are made or maintained by a physician, psychiatrist, psychologist, and which are made and maintained in connection with the provision of treatment to the Party, unless that Party provides his or her voluntary, written consent to do so.

41

### 12.4.5 Polygraph Test Results

The results of polygraph tests will not, under any circumstances, be considered when making a determination of whether Prohibited Conduct occurred or whether the Policy was violated.

### 12.4.6 Opportunity to Inspect Evidence

Prior to the creation of a written Investigative Report, and to provide a fair and equal opportunity for both Parties to inspect and review evidence, the Investigator will send concurrently to the Complainant and Respondent all evidence that was obtained as part of the Investigation that is directly-related to the allegations raised in the Formal Complaint. In addition to relevant evidence, this includes evidence that the University does not intend to rely on in reaching a determination regarding responsibility, as well as inculpatory or exculpatory evidence, no matter the source. Such evidence will also be sent to the Party's advisor, if any. The evidence subject to review and inspection may be sent in an electronic or hard copy format. The Complainant and Respondent shall have ten (10) days to submit a written response to the evidence, including any reasons why certain evidence is not relevant and therefore should not be included in the Investigative Report. The Investigator will consider any written response(s) received prior to completing an Investigative Report.

### 12.4.7 The Investigative Report

After the evidence under the previous section has been provided to the Parties and their advisors, if any, and they have been given an opportunity to review and respond to it, the Investigator will prepare a written Investigative Report within ten (10) days. The Investigative Report includes all evidence that the Investigator determined to be relevant. The Investigative Report may include such evidence as the Formal Complaint, written statements, summaries of all interviews, photographs, descriptions of relevant evidence and a detailed report of the events in question. The Investigative Report will include a fair, thorough, and accurate summary of the relevant evidence. It may also include recommended findings and conclusions. The Investigator will share the Investigative Report with the Executive Director/Title IX Coordinator, who will make it concurrently available (in electronic format or hard copy) to the Complainant and to the Respondent and their chosen advisors, if any, for review and written response at least ten (10) days prior to the Hearing or the Investigator's determination of responsibility. The Parties may discuss the Investigator's conclusions, including conclusions about the relevancy of evidence, in their written response and/or at any required Hearing. Neither Party nor their advisors may make photocopies of the Investigative Report. All Parties and advisors to whom the Investigative Report is distributed pursuant to this Policy must maintain it in confidence (even after the resolution of the Formal Complaint); the Investigative Report may only be disclosed by the Parties as contemplated by this Policy.

## 13.   Hearing Procedures for Formal Complaints of Sexual Harassment

For Formal Complaints alleging Sexual Harassment, as defined in this Policy, where Informal Resolution was not reached and the Formal Complaint was not otherwise withdrawn or dismissed, a live Hearing will be conducted by a Hearing Officer who will determine whether the Respondent is responsible for the alleged Sexual Harassment in violation of this Policy. If the Formal Complaint also contains allegations of Prohibited Conduct other than Sexual Harassment and the Prohibited Conduct arises out of the same incident or facts as the alleged Sexual Harassment, then all allegations of Prohibited Conduct in the Formal Complaint will proceed under this section. If the Hearing Officer finds that the Respondent is responsible, then the Hearing Officer will determine the appropriate sanction(s) that the University will impose on the Respondent for all of the Prohibited Conduct found to have occurred.

### 13.1   Appointment of the Hearing Officer

The Executive Director/Title IX Coordinator (if the Respondent is a student) or the Executive Vice President for Human Resources/Deputy Coordinator (if the Respondent is an employee) will appoint a trained Hearing Officer. The Complainant and Respondent will receive concurrent written notice of the name of the Hearing Officer before the Hearing.

### 13.1.1 Qualifications of the Hearing Officer

The Hearing Officer will not have had any previous involvement with the investigation or any Informal Resolution. Moreover, the Executive Director/Title IX Coordinator and the Investigator who investigated the matter may not serve as the Hearing Officer.

The Hearing Officer must be impartial and free from actual bias or conflict of interest. Actual bias or conflict of interest occurs when a Hearing Officer is biased by favoring or disfavoring either Party or by favoring or disfavoring a certain outcome, for any reason extrinsic to the Hearing Officer's role and function as a fair and objective adjudicator. A Hearing Officer may also be biased when he or she is unable to make a fair and objective determination based only on the relevant evidence.

When a Hearing Officer has actual bias or a conflict of interest, the Hearing Officer must promptly recuse himself or herself prior to the Hearing. The Hearing Officer must recuse himself or herself whenever he or she (1) is a Witness in the matter; (2) is the spouse, parent, child, or immediate family member of a Party; (3) is biased, prejudiced, or personally interested in the matter or its outcome, or biased or prejudiced toward or against a Party or any Witness, or against Complainants or Respondents generally, to such an extent that he or she would be unable to be fair, objective, and impartial; or (4) would be unable, for any other reason, to be fair, objective, and impartial. The recusal of a Hearing Officer requires not only a finding of actual bias or conflict of interest, but also that the actual bias or conflict of interest is of a substantial nature and based on more than conclusory allegations, or on a professional relationship or personal acquaintanceship.

43

### 13.1.2 Challenging the Appointment of the Hearing Officer

The Parties may challenge the appointment of the Hearing Officer by submitting a written objection to the Executive Director/Title IX Coordinator or the Executive Vice President for Human Resources/Deputy Coordinator (depending on whether the Respondent is a student or an employee, as stated above) within three (3) days of receipt of the written notice of the appointment of the Hearing Officer. Such objection must state the specific reason(s) for the objection. The Executive Director/Title IX Coordinator will evaluate the objection and determine, in consultation with the Vice President for Student Affairs and/or the Vice President for Human Resources/Deputy Coordinator, as appropriate, whether to appoint a different Hearing Officer. A different Hearing Officer will typically be appointed only when the Executive Director/Title IX Coordinator objectively determines that one or more of the criteria for recusal has been met. Failure to submit a timely and proper objection will constitute a waiver of any right of objection. Any change in the appointment of the Hearing Officer will be provided in writing to both Parties prior to the date of the Hearing.

### 13.2    Hearing Policies and Procedures

**Investigative Report and Directly-Related Evidence.** All directly-related evidence (including relevant evidence) that was made available to the Parties and the Parties' advisors (if any) for inspection and review under Section 12.4.6 will be available at the Hearing to give the Hearing Officer and each Party an equal opportunity to refer to such evidence during the Hearing. In order to make such evidence available, the Investigator will submit the evidence subject to inspection and review, as well as any written responses by the Parties and their advisors to the evidence to the Hearing Officer in advance of the Hearing. The Investigator will also submit the Investigative Report and any written responses by the Parties and their advisors to the Investigative Report to the Hearing Officer in advance of the Hearing. Both Parties will have had a fair opportunity to review and respond to all directly-related evidence that could potentially be considered by the Hearing Officer when making a determination.

**Notice of Hearing**. Within ten (10) days after delivery of notice of the appointment of the Hearing Officer to the Parties, the Hearing Officer will provide a separate, written Notice of Hearing to each of the Complainant, the Respondent, and any Witnesses identified by the Parties, requesting such individual(s) to appear before the Hearing Officer. The Notice of Hearing will contain the date, time, and location of the Hearing.

**Submission of Witness and Exhibit Lists by Complainant and Respondent**. Within three (3) days of receiving the Notice of Hearing, the Complainant and the Respondent must send to the Hearing Officer a list of any Witnesses and exhibits (e.g., documentary evidence) that they intend to use at the Hearing, a brief description of each proposed Witness's connection to and/or knowledge of the allegations in dispute, and a brief description of any exhibits that they intend to present at the Hearing. Without such proper notice, the Witnesses and exhibits will not be allowed at the Hearing or considered by the Hearing Officer, unless the other Party provides his or her consent. The Hearing Officer will provide written notice of

44

these Witnesses and exhibits to both Parties concurrently at least three (3) days prior to the Hearing.

**Failure to Appear**.  If the Complainant <u>and/or</u> the Respondent fails to appear before the Hearing Officer and such Party was provided the proper Notice of Hearing as set forth above, then, absent extenuating circumstances, the Hearing Officer will proceed with the Hearing to the extent possible and determine the resolution of the Formal Complaint.  The failure of a Party to appear will not be used as evidence against that Party, and the Hearing Officer will make a determination based on the available evidence.

**No Contact Prior to the Hearing**.  From the time the Respondent received notice of the Complaint, the Complainant and the Respondent may not contact each other outside of the Hearing, whether directly or through another person, even to discuss the Hearing (except as directed during an Informal Resolution process).  Such inappropriate contact may be considered a violation of another University honor code and in some cases, a Prohibited Conduct under this Policy.

**Advisor Provided if Needed**.  Both the Complainant and the Respondent may select an advisor of their choice to assist them during the Hearing.  If either Party has not selected an advisor for the Hearing, the University will appoint to that Party, without charge or fee to the Party, a trained advisor for the Hearing.

**Presentation of Evidence.**  The Complainant and the Respondent will have a fair and equal opportunity to present evidence, including arguments and any prior-noticed Witnesses and exhibits, to the Hearing Officer.  All directly-related evidence will be available at the Hearing to give each Party a fair and equal opportunity to refer to such evidence during the Hearing, including for the purpose of cross-examination. The Complainant and the Respondent, through their advisors, will also have an opportunity to cross-examine the other Party's Witnesses, including the other Party.  Cross-examination must be conducted directly, orally, and in real time by the Parties' respective advisors and may not be conducted by the Parties themselves. The Witnesses, including the Parties, may choose not to testify, or not to face cross-examination.  However, the Hearing Officer will not rely on any statement by a Witness or Party that the other Party (through his or her advisor) did not have an opportunity to cross-examine when making its determination of responsibility.  Also, the Hearing Officer may not draw adverse conclusions nor base a responsibility determination on the absence of a Witness to appear/testify during a Hearing or the refusal of a Party to face cross-examination.  The Hearing Officer must only consider the evidence available.  This section does not apply to or prohibit the Hearing Officer's consideration of evidence that was gathered during the investigation, because both Parties had a fair opportunity to review and respond to such evidence prior to the Hearing.

### 13.2.1 Evidentiary Matters

Any evidence that the Hearing Officer determines is relevant and credible may be considered, provided such evidence that was presented at the Hearing was subject to an

opportunity to be cross-examined. The Parties may object to the relevancy of a question to a Witness by the other Party.  In this circumstance, the Hearing Officer must determine if the question is relevant before the Witness answers the question.   If the Hearing Officer determines *sua sponte* (of his or her own accord) that the question is irrelevant, the Hearing Officer will explain his or her decision to exclude the question as irrelevant.  If the Hearing Officer decides to exclude any evidence in the Investigative Report as irrelevant, the Hearing Officer will explain the decision to exclude the evidence in his or her written determination. Evidence of the Complainant's sexual history or predisposition will not be permitted, unless at least one of the exceptions stated in Section 12.4.2 is present.

### 13.2.2 Alternative Hearing Participation Options

At the request of either Party, Liberty will provide for the Hearing to occur with the Parties located in separate rooms with technology enabling the Hearing Officer and the Parties to simultaneously see and hear each other, as well as any Witnesses. If one or both Parties prefer not to attend or cannot attend the Hearing by being physically present in the same geographical location, they may request alternative arrangements from the Hearing Officer for virtual appearance that may be provided at Liberty's discretion, with technology enabling participants to simultaneously see and hear each other.  Any Witness who prefers not to or cannot attend in person must contact the Hearing Officer at least five (5) days in advance so appropriate arrangements can be made.

### 13.2.3 Recordings of the Hearing

The Hearing Officer will arrange for the audio or audiovisual recording or transcript of the Hearing.  This recording will be the property of the University, but each Party is entitled to inspect and review it after the Hearing.  The Appeals Board may use the recording as part of the Appeal process.

### 13.2.4 Notice of Hearing Outcome and Sanctions

Following the conclusion of the Hearing, the Hearing Officer will deliberate in closed session. Within seven (7) days, the Hearing Officer will render a determination based on the preponderance of the evidence whether it is more likely than not that the Respondent violated the Policy as alleged.  The Hearing Officer will prepare a written Notice of Hearing Outcome that includes: (1) identification of the allegations potentially constituting Sexual Harassment, as well as those of other forms of Prohibited Conduct that were consolidated for the Hearing due to arising out of the same incident or facts; (2) a description of the procedural steps taken from the receipt of the Formal Complaint through the determination, including all notifications sent to the Parties, as well as interviews with the Parties and Witnesses (if any); (3) site visits by the Investigator (if any); (4) methods used to gather other evidence; (5) details related to the Hearing; (6) findings of fact supporting the Hearing Officer's determination; (7) conclusions regarding the application of Liberty's Policy to the facts; (8) a statement of the result as to each allegation of Prohibited Conduct, including the Hearing Officer's determination regarding responsibility for each allegation, rationale for his

or her determination of each allegation, and sanctions that Liberty imposes for any finding of "Responsible"; (9) whether remedies designed to restore or preserve equal access to Liberty's educational program or activity will be provided by Liberty to the Complainant without specifying the nature of such remedies; and (10) Liberty's procedures and permissible grounds for each Party to appeal (see Section 16 for information about the Appeals process). The Hearing Officer will provide this Notice of Hearing Outcome (including any sanctions) concurrently to the Parties and the Executive Director/Title IX Coordinator via email.  After providing the Notice of Investigative Outcome, the Hearing Officer may, in his or her discretion, invite the Parties and their advisors, if any, to individually meet with him or her to discuss the outcome. If that meeting invitation is extended, it will be extended to both Parties.

## 14.  Resolution of Formal Complaints of Prohibited Conduct Other Than Sexual Harassment

For Formal Complaints of Prohibited Conduct that do not involve Sexual Harassment under this Policy, determinations of responsibility and sanctioning decisions (if any) will be made by the Investigator (unless such allegations of Prohibited Conduct were consolidated with allegations of Sexual Harassment for a Hearing due to arising out of the same incident or having the same facts). The Parties and their advisors, if any, have the same opportunity to inspect and review the evidence under Section 12.4.6, as well as submit written responses to the evidence at least ten (10) days prior to the completion of the Investigative Report. During that ten (10) day period, the Parties and their advisors will have the opportunity to: (1) individually meet again with the Investigator; (2) provide written comments or feedback; (3) submit questions for the Investigator to ask the other Party or Witnesses; (4) submit additional information; (5) identify additional Witnesses and relevant areas of inquiry; and (6) request the collection of other evidence by the Investigator. Should the Parties or their advisors submit any new evidence, each Party and their advisors, if any, will have three (3) additional days to review only the additional relevant evidence and provide a response to it. The Investigator may provide more review and response time, if necessary, to provide a fair and meaningful opportunity for both Parties to respond to the evidence.  The Parties will have a fair and meaningful opportunity to review and respond to all evidence that will be considered by the Investigator when making a determination in the matter.

After the review and response period, after considering all relevant evidence received during the investigation, the Investigator will supplement the Investigative Report with his or her determination, using the preponderance of the evidence standard of review, of whether the Respondent committed the alleged Prohibited Conduct in violation of the Policy; the findings of fact and rationale supporting the determination; sanctions, if any; and information about the appeals process.  The Investigator will send a written Notice of Investigative Outcome (with the updated Investigative Report) to both Parties concurrently, as well as to the Executive Director/Title IX Coordinator.  This Notice of Investigative Outcome will typically be sent within 15 days of the Parties' completion of the review and response period but may be delayed for good cause.   After sending the Notice of Investigative Outcome, the Investigator may, in his or her discretion, invite the Parties and their advisors, if any, to

individually meet with him or her to discuss the outcome. If that meeting invitation is extended, it will be extended to both Parties.

## 15.    Sanctions

A full list of sanctions can be found in the OEC Sanctioning Guidelines document and will be made available to Complainants and Respondents both online and prior to beginning any investigation or resolution process under this Policy.  The OEC Sanctioning Guidelines is incorporated herein by reference.  The OEC Sanctioning Guidelines document includes two separate lists of all available sanctions that can be assigned to students and employees. When a Respondent who is both a student and an employee of the University is found responsible for Prohibited Conduct, appropriate sanctions from both lists can be imposed. The sanctions include a full range of disciplinary measures based on what the Investigator or Hearing Officer deems appropriate based on the Prohibited Conduct found to have occurred.  Sanctions may range from warnings to permanent dismissal (for students) or termination (for employees).

## 16.    Appeals

Either Party may accept or contest the outcome and/or the sanction(s), as decided by the Hearing Officer or Investigator. Either Party may also appeal the dismissal of a Formal Complaint of Sexual Harassment, as defined under this Policy.  Appeals must be made on at least one (1) of the following grounds:

> (1) a procedural irregularity that may have affected the outcome of the matter or the dismissal;

> (2) new evidence that was not reasonably available at the time the determination regarding responsibility or decision to dismiss was made that could affect the outcome or dismissal of the matter; or

> (3) the Executive Director/Title IX Coordinator, Deputy Coordinator, Investigator, Hearing Officer, or other decision-maker had a conflict of interest or bias for or against Complainants or Respondents generally, or the individual Complainant or Respondent involved in the matter/dismissal,  and that conflict of interest or bias affected the outcome/dismissal of the matter.

To appeal the outcome, the sanction(s), and/or a dismissal of a Formal Complaint of Sexual Harassment, the appealing Party or Parties must submit a written statement (which may be submitted by email) to the Investigator or to the Executive Director/Title IX Coordinator within (5) five days of receiving notification of the outcome, the sanction(s), or dismissal. That statement should contain at least one of the three grounds for appeal listed above, as well as supporting explanation(s).  Any appeal statement received after five (5) days of notification of the outcome or dismissal is regarded as untimely and will not be considered.

48

If no statement requesting appeal is received within five (5) days, the outcome, sanction(s), and/or dismissal will be final and not subject to further appeal.

If a statement requesting appeal is submitted, the non-contesting Party is notified in writing. The non-contesting Party will have an opportunity to review and respond in writing to the appealing Party's request for appeal of the outcome, sanction(s), and/or dismissal. Responses from non-contesting Parties must be received by the OEC within three (3) days. If a timely response is not received by the OEC, the Appeals Board will objectively conduct its appeal proceedings without drawing any negative inference to the Party who did not provide a response.  The OEC will provide the Investigative Report (if any), the request for appeal from the appealing Party, and any response from the non-contesting Party, together with all evidence related to the request(s) for appeal, to the Appeals Board.  The Appeals Board will determine, based on the evidence provided to it, whether the request for appeal is timely and properly based on one of the three grounds for appeal listed above.  If it meets those requirements, the Appeals Board will determine whether any stated ground for appeal was met.  The Appeals Board will typically be scheduled within ten (10) days of the OEC's receipt of all evidence related to the request(s) for appeal, including the Parties' submissions concerning appeal.  This timeframe may be adjusted for good cause.

### 16.1   Appeals Board Composition

The Executive Director/Title IX Coordinator maintains a standing pool of trained University employees (including faculty) and, at the discretion of the Executive Director/Title IX Coordinator, external trained professionals that are available to serve on the Appeals Board. The Executive Director/Title IX Coordinator will, subject to availability, select (a) three members from this pool to serve on the Appeals Board, and (b) the Vice President for Equity and Inclusion, or an additional member from this pool, to serve as the non-voting Chair of the Appeals Board. The Appeals Board will not include the Executive Director/Title IX Coordinator or any Deputy Coordinator, Investigator, or Hearing Officer who was involved in the underlying matter that is being appealed.   All members of every Appeals Board (including its Chair) must be impartial and free from actual bias or conflict of interest.  Actual bias or conflict of interest occurs when a member of the Appeals Board is, for any reason extrinsic to the Appeals Board's role and function as a fair and objective adjudicatory body as set forth in this Policy, in favor of or against either a Party or a certain outcome, or when a member of the Appeals Board is unable to make a fair and objective determination based only on the relevant evidence.  When a member of the Appeals Board has actual bias or conflict of interest, that member must promptly recuse himself or herself prior to when the Appeals Board convenes.  A member of the Appeals Board (including its Chair) shall recuse himself or herself when he or she is a (1) is a Witness in the matter; (2) is the spouse, parent, child, or immediate family member of a Party; (3) is biased, prejudiced, or personally interested in the matter or its outcome, or biased or prejudiced toward or against a Party or any Witness, or against Complainants or Respondents generally, to such an extent that the member would be unable to be fair, objective, and impartial; or (4) would be unable, for any other reason, to be fair, objective, and impartial. The recusal of a member of the Appeals Board requires not only a determination of actual bias or conflict of interest by the recusing

member, but also his or her determination that the actual bias or conflict of interest is of a substantial nature and based on more than conclusory allegations, or on a professional relationship or personal acquaintanceship.

### 16.2   Standard of Review for Appeals

Using the preponderance of the evidence standard of review, the Appeals Board will determine, by majority decision, (1) if the request for appeal is properly based on one of the three grounds for appeal listed above and (2) whether any stated ground for appeal was met. The Appeal Board's review will be narrowly-tailored to whether a proper basis for appeal was raised and the stated ground(s) for appeal.

### 16.3   Determination by the Appeals Board

Neither Party, a Hearing Officer (if any) nor the Investigator will appear before the Appeals Board.  The Appeals Board will make its determination based solely on the written appeals, and the evidence available to it from the Hearing or Investigation.  The Appeals Board will not reweigh the facts beyond what is necessary to make its determinations, nor will it make its own determination of whether the Prohibited Conduct occurred and then substitute it for the determination of the Investigator, Hearing Officer, or other decision-maker.

If the Appeals Board determines, by majority decision, either that no proper ground for appeal was stated or that no properly stated ground for appeal was met, the outcome reached by the original decision-maker will be upheld.

If the Appeals Board determines, by majority decision, to grant the appeal, the Appeals Board will send the matter to the Executive Director/Title IX Coordinator with instructions on how to fairly remedy the defect(s), which may include one or a combination of the following: vacating the dismissal and resuming the Formal Resolution or Informal Resolution process; overturning the outcome and/or any or all of the sanction(s); issuing new or different sanction(s); appointing a new Investigator or Hearing Officer; remanding the matter to the same or new Investigator or Hearing Officer for further Investigation or Hearing, and/or to cure the material procedural error; or taking some other action that sufficiently remedies the defect(s) in a way that is fair to both Parties and the integrity of the process under the circumstances.

If the Appeals Board upholds an outcome that there was insufficient evidence to support a finding that the Respondent violated this Policy, the matter will be considered resolved and the matter will be closed.   Appropriate Supportive Measures, including No-Contact Directives issued to both Parties, may remain in effect regardless of the outcome.  No-Contact Directives are considered preventative, not punitive, by the University.

The Parties will receive prompt and simultaneous written notification of the Appeals Board's determination and its rationale.  Parties can typically expect it to take ten (10) days to receive

this written notice. The determinations of the Appeals Board are final resolutions and are not subject to further appeal.

## 17.   Notice of Final Outcome

As explained above, following the conclusion of the appropriate Final Resolution process (an Investigation or a Hearing), both the Complainant and the Respondent will receive a written Notice of Outcome. If there is no appeal by either Party, then that written Notice of Outcome becomes the Notice of Final Outcome. If there is an appeal, the Parties will receive a written Notice of Final Outcome containing the same information (except for information about what portions are subject to appeal) as soon as possible after the appeal has concluded, but often within ten (10) days.

The OEC will also notify relevant administrative and academic offices, including the Financial Aid Office, the Registrar, Human Resources, LUPD, the Dean of Students Office, and the OCL, as appropriate and necessary to ensure that sanctions and remedies are implemented promptly.

## 18.   Prevention and Awareness Programs

The University is committed to the prevention of Prohibited Conduct through regular and ongoing education and awareness programs. The University provides coordinated programming and training through multiple offices and departments, including the OEC, the Dean of Students Office, LUPD, Human Resources, the Provost's Office, the OCL, Student Counseling Services (SCS), and other Liberty University offices and departments.

## 19.   External Reporting

Concerns about the University's compliance with applicable laws related to this Policy may be reported to appropriate government agencies. Concerns related to Title VI, Title IX, the ADEA, and Section 504 may be addressed to the United States Department of Education, Office for Civil Rights (OCR) (at OCR@ed.gov or 800.421.3481) or to the United States Equal Employment Opportunity Commission (EEOC) (at info@eeoc.gov or 800.669.4000), with jurisdiction depending on whether the complainant is a student or an employee. Concerns related to the Clery Act may be reported to the United States Department of Education, Clery Act Compliance Division (at clery@ed.gov). Concerns related to FERPA may be reported to the United States Department of Education, Family Policy Compliance Office (FPCO) (at FERPA.Complaints@ed.gov). Concerns related to Title I of the ADA may be reported to the United States Department of Justice (at https://www.ada.gov/filing_complaint.htm).

## 20.   Annual Review

This Policy is maintained by the University's Office of Equity and Compliance. The University will review this Policy at least annually. The review will take into account evolving legal

requirements, evaluate the supports and resources available to the Parties, and assess the effectiveness of investigation and resolution processes.  This Policy does not create a contractual obligation on the part of the University.  The University reserves its right to amend this Policy at any time and for any reason, including an informal amendment to ensure fairness in the processes and procedures set forth in this Policy.  This Policy was last revised on August 14, 2020.