**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Lynchburg Division**

| | |
|---|---|
| **SHEA WHITEHURST** | |
| *Plaintiff* | |
| **v.** | Case No.:_____6:21CV00059_____ |
| | **JURY TRIAL DEMANDED** |
| **LIBERTY UNIVERSITY, INC., and CHARLES TIPPETT** | |
| *Defendants* | |

## AMENDED COMPLAINT

**COMES NOW**, Plaintiff ("**Shea Whitehurst**", "**Whitehurst**", or "**Plaintiff**"), through her attorney, Fluet and Associates, PLLC, hereby file this complaint against Liberty University, Inc. ("**Liberty**", "**the University**," or "**Liberty University**"), and Mr. Charles Tippett ("**Defendant Tippett**" or "**Tippett**" collectively "**Defendants**"), and in support thereof alleges as follows:

## SUMMARY

On the night of October 30, 2020, Plaintiff was subjected to a date rape by Defendant Tippett, who used alcohol and a "roofie" to render the Plaintiff incapacitated and then proceeded to penetrate and impregnate her. Plaintiff considered Tippett a friend and trusted him because of their shared status as Liberty University students. Plaintiff a deeply religious young woman, wrongly assumed that Tippett shared the University's professed emphasis on abstinence from pre-marital sex and responsible personal behavior. She was wrong, and Tippett, apparently mixing a cocktail of alcohol and narcotics, rendered Plaintiff unable to avoid his sexual assault.

1

Plaintiff reported the matter to the University, which rather than take action, deterred the Plaintiff from taking proper steps to pursue her perpetrator, shifted the focus onto Plaintiff's consumption of alcohol and allowed her rapist to graduate unscathed. The University's conduct was not isolated and was part of a broader philosophy that failed to address, deter, or punish sexual assault. As a result of the confluence of interests between an assailant desirous of avoiding the consequences of his actions and an institution desirous of understating and undermining claims that sexual assaults were occurring, the Plaintiff was left not only without a remedy, but with an unwanted pregnancy terminated by miscarriage, emotional and physical scars, and a belief that she was responsible for the violence inflicted upon her.

This suit seeks to remedy that injustice and to address a toxic breeding ground for sexual assault that Liberty created and countenanced.  She brings direct claims against the perpetrator and Title IX claims against the errant university.

## PARTIES

1.      <u>Defendant Liberty University:</u> is a Virginia Corporation that does business in the Commonwealth of Virginia through its educational campus in Lynchburg, Virginia as well as in the Commonwealth of Virginia through its "Liberty University Online" program and interactive website, which solicits payment and actually provides educational services, remotely, to residents of Virginia. Liberty University claims to have more than 100,000 students in its online and on-campus programs, including 25,000 students in Virginia.

2.      <u>Defendant Charles Tippett:</u> is a former Liberty University student who graduated in May 2021. He currently resides in Georgia and is believed to be a resident of that State.

2

3.     <u>Plaintiff Shea Whitehurst</u>: was a Liberty student during the time of the events alleged. Plaintiff currently resides abroad pursuing her studies and anticipates graduating from Liberty University in 2022.

## JURISDICTION

4.     This court has jurisdiction over these claims pursuant to 28 U.S.C. §1331, because the claims implicate a federal question arising from laws of the United States (Title IX) and 28 U.S.C. 1332, because there exists diversity jurisdiction for claims which exceed $75,000. Additionally, this Court has supplemental jurisdiction over the remaining state court claims pursuant to 28 U.S.C. § 1367(a).

5.     On information and belief, Liberty University receives in excess of $800 million dollars in federal money annually which is distributed in this judicial district. That money consists largely of financial aid to its students which pays student tuition and fees to the school. In 2017, one of the most recent years for which figures are available, Liberty University students received more than $772 million in total aid from the Department of Education – nearly $100 million of it in the form of Pell grants and the rest in federal student loan awards. In 2017, among universities nationwide, it ranked sixth in receipt of federal aid. Thus, though it is a private university, the vast majority of its funding comes from the federal government and is spent within the judicial district.

## VENUE

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the University is a corporation residing in and subject to personal jurisdiction in this District, and the majority of the acts complained of occurred in this District.

## FACTS

7.     Shea Whitehurst is a college student at Liberty University. She began attending the University in Fall 2019 and is expected to graduate in 2022. Because she is a college student, she

is domiciled in neither Virginia nor Georgia.

8.    At the time of the incident, Whitehurst was located in Lynchburg, Virginia in order to attend her classes at the University.

9.    Whitehurst is a Liberty University student athlete, competing on behalf of the University.

10.    Whitehurst is a deeply religious woman who decided to attend the University primarily due to its conservative Christian values. These values included a prohibition on pre-marital sexual activity.

11.    Whitehurst's family is deeply religious, and she grew up in a conservative Christian faith that emphasized avoiding sexual intercourse until marriage.

12.    Liberty University's code of conduct "The Liberty Way" also prohibited pre-marital sexual activity.

13.    On October 30, 2020, Defendant Tippett raped Whitehurst. Whitehurst believes Tippett used a drug of some sort, commonly called a "roofie" to incapacitate her physically and render her unable to consent to the subsequent forcible intercourse he inflicted.

14.    At the time of the rape, Tippett was aware that Whitehurst was dating another student.

15.    Prior to the rape, Whitehurst considered Tippett a friend. She had no romantic relationship with him of any kind prior to his raping her. Whitehurst believes Tippett had a girlfriend at the time of the rape.

16.    In the evening of October 30, 2020, Whitehurst visited Tippett at his apartment.

17.    Tippett provided alcohol to Whitehurst in the form of "hard" iced teas, which normally carries a low alcohol content of between 5% and 8% alcohol by volume.

18.     At the time of the rape, Tippett lived in an off-campus apartment, which is located in Lynchburg, Virginia.

19.     When Whitehurst arrived Tippett was alone. Whitehurst had discussed getting together with Tippett and others and was under the impression that they would socialize as a group.

20.     Tippett provided Whitehurst with at least two alcoholic drinks. Whitehurst believes these were "hard" iced teas.

21.     Mr. Tippett then offered Whitehurst a third alcoholic beverage. Unlike the prior two drinks, Tippett prepared the drink himself, and did so outside of the view of Whitehurst.

22.     Within 20 minutes of consuming the third drink, Whitehurst lost consciousness and was incapacitated physically and mentally.

23.     Regaining consciousness, Whitehurst realized her clothes had been stripped.

24.     Tippett then forcibly engaged in sexual intercourse with Whitehurst, without consent, using force and against her will. Whitehurst recalls being unable to speak or move her limbs and she was groggy and unable to resist or protest.

25.     Whitehurst's reactions are consistent with someone who has been drugged and she believes that Tippett mixed her third drink with some form of narcotic or other intoxicating substance to incapacitate and overpower her.

26.     After Tippett eventually stopped raping Whitehurst, Tippett threw Whitehurst's clothes at her and demanded she leave, when Whitehurst was unable to coherently respond, Tippett told her to get in his vehicle and he drove to her apartment and dismissed her form the vehicle.

27.     The following day a battered and bruised Whitehurst, went to Lynchburg General Hospital and reported being raped.  A Physical Evidence Recovery Kit ("PERK") colloquially known as a "rape kit" was administered.

28.     Whitehurst was experiencing severe chest pain and had multiple bruises on her shoulder and legs, which were consistent with the use of force to hold her down and assault and batter her.

29.     Whitehurst was so bruised and in pain that she could not attend her athletic practice, when her coach pressed her on her reasons, she told him that her legs had been severely bruised. The coach, without Whitehurst's knowledge, informed the University of her condition.

30.     In early November 2020, a representative from the University's Title IX office contacted Whitehurst. Still traumatized, embarrassed, and humiliated from the rape, Whitehurst was reluctant to speak. The University did not clearly advise Whitehurst that her report would be confidential.

31.     Whitehurst's reluctance to report was based on the University's failure to protect other victims of sexual assault, and its tendency to punish the victims of the assault rather than the perpetrators.

32.     Whitehurst was aware that the University tended to focus on the behavior of the victims. As she had consumed alcohol, Whitehurst was concerned that she would be targeted for this infraction, but the rape would go unpunished. Her concerns proved to be well founded.

33.     Whitehurst told the Title IX representative that she had been sexually assaulted. This statement was apparently recorded by the Title IX office, but Whitehurst was not provided with a copy of her own statement.

34.     Whitehurst was uncomfortable telling the University that a student had raped her. Later, a Title IX representative called another time, stating that a professor had reported Tippett as the assailant.

35.     Approximately three months later, Whitehurst visited the Title IX office and had a four- hour meeting with the University's Title IX representative. During that meeting, Whitehurst disclosed Tippet as her assailant. This statement was apparently recorded, but once again the University failed to provide a copy of this recording to Whitehurst.

36.     Although Whitehurst was informed that she could seek a formal complaint, the representative lobbied her to pursue the informal mediation option. The representative discouraged Whitehurst from pursuing a formal complaint by advising her that if she chose that route, she would need to face Tippett directly in the same room.

37.     The University, through the Title IX representative or another agent, did not advise Whitehurst to seek a criminal complaint or advise her that she should do so to receive additional resources or protection. The office provided written guidance which was contradicted by what was stated in meetings, creating serious confusion for what potential avenues Whitehurst had available to her. The Title IX Office also did not explain what processes were available from other entities with sufficient clarity, sewing additional confusion.

38.     In the spring of 2021, without Whitehurst's knowledge or consent, the Title IX office sent a joint electronic mail message to Whitehurst and Tippett setting forth Whitehurst's claims against Tippett.

39.     Incredibly, the University then advised Whitehurst that her only recourse against Tippett was not to pursue him for rape, but to seek to have the school's honor code, "the Liberty Way".

40.     Whitehurst became pregnant due to the rape. Consistent with her convictions she sought to continue the pregnancy through term. At seven weeks, Whitehurst miscarried.

41.     Whitehurst's introduction to sexual intercourse was an act of violence. Her pregnancy was not a choice but imposed upon her. Her dreams of having children through a loving marriage were destroyed and her initial pregnancy ended in a tragic miscarriage.

42.     Since the rape, Whitehurst has shown numerous signs of severe post-traumatic stress disorder ("PTSD"), including, intrusive thoughts, an extreme startle reflex, difficulty concentrating had a hard time focusing, both in and out of academics. She has also gained weight and struggles with flashbacks to the assault these symptoms are consistent with severe PTSD.

43.     Whitehurst's actions in seeking justice against her assailant were thwarted, perhaps intentionally by the University. For nine months the University failed to explain the process and seemed to try to dissuade Whitehurst from taking action. When she did decide to move ahead, they stalled the process, which allowed the rapist to graduate unscathed. Only after this was Whitehurst was advised that Liberty refused to act because the assault took place off campus, a fact clearly known to the University at an early stage of the process.

44.     In the summer of 2021, the Director of the University led internship that Whitehurst was participating in expressed an intention to terminate Whitehurst from that internship based on an expressly stated concern that Whitehurst intended to take legal action against the University (for the violation of Title IX).

45.     Specifically, the Director informed Whitehurst and others at a meeting that, "If she's [Whitehurst] suing the University, she can't work with us."

8

46.     In retaliation, Whitehurst submitted written work for her internship, which was mysteriously deleted from the internal board it was supposed to appear on. This occurred more than once.

47.     Whitehurst made inquiries regarding the deletion that were ignored. Whitehurst became alarmed and concerned that she was being frozen out of her internship and effectively fired due to a perception that Whitehurst was going to sue Liberty University.

48.     There is no lawful reason for Whitehurst to be excluded from full participation in any student groups due to her assertion of her protected rights. This is particularly true if she was intending to pursue any complaint process involving her rights protected by Title IX. The University representative's stated intention to exclude Whitehurst from full participation in her internship, followed by her actual exclusion from full participation, constitutes illegal retaliation.

## LIBERTY VIOLATED TITLE IX IN ITS
## FAILURE TO ADDRESS WHITEHURST'S RAPE

49.     Title IX (initially the Education Amendments of 1972, renamed the Patsy T. Mink Equal Opportunity in Education Act in 2002) provides that no "person in the United States shall, on the basis of sex, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance…" 20 U.S.C. §§ 1681-1688.

50.     Title IX has no explicit statute of limitations and, as a result, federal courts apply the most appropriate or analogous state statute of limitations. In this case, as the events at issue occurred less than two years prior to filing of these claims, they are timely under Virginia law and thus timely filed under Title IX.

51.     Amendments made to Title IX in 2020 strengthened provisions related to the duties of educational institutions to root out and address sexual harassment and sexual assault claims.

52.     Under these amendments, when a school or university has actual knowledge of sexual harassment, including sexual assault,  must take action that is not deliberately indifferent to the proscribed conduct.[1]

53.     "Sexual assault" is defined in 20 U.S.C. 1092(f)(6)(A)(v) as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation."

54.     Tippett's rape of Plaintiff on October 30, 2020, is an obvious and severe form of both sexual assault and form assault and battery. Even in a dating relationship, the FBI defines the acts committed against the Plaintiff as a form of actionable violence.  Thus, the conduct is covered by Title IX.

55.     Liberty University knew, or should have known, this to be true after Plaintiff reported the incident, and the University should have implemented safety measures following a thorough investigation into the Mr. Tippitt's conduct, given the grave nature of the sexual assault perpetrated against the Plaintiff.

56.     Representatives from the Liberty University Title IX office actively discouraged Plaintiff from pursuing a formal complaint, or other remedies against Tippett. Apparently to allow Tippett to graduate from the University without blemish.

57.     Following the rape, Tippet faced no consequences. The University appears not to have had nor did it propose or provide either a safety plan or accommodations as required by Title IX.  They placed the burden on Whitehurst to name what accommodations she needed, rather that stating what accommodations could be offered.

58.     The University failed to appropriately investigate or address the acts of sexual

---

[1] U.S. Dep't of Educ., *Questions and Answers on the Title IX Regulations on Sexual Harassment* at 13 (July 20, 2021).

violence perpetrated against Whitehurst.

59.     Further, the University misused the Title IX process to subvert Whitehurst's rights to pursue remedies against Tippett and to delay action against her assailant.

60.     The University failed to follow the procedural and due process requirements set forth under Title IX in an apparent effort to minimize and conceal the rape of Whitehurst and to dissuade her form timely reporting the act or seeking remedies available to her.

61.     These acts and omissions by Liberty constitutes a deliberate indifference to the obligations imposed on the University, under the 2020 Title IX standard.

62.     Moreover, as other cases recently filed against the University reveal, the University had a pattern and practice of dissuading sexual assault victims from reporting and pursuing allegations of sexual assault against female students.[2]

63.     These deliberate actions display a reckless, if not intentional, indifference to the obligations imposed under Title IX.

64.     Liberty University's inadequate response to sexual assault has been acknowledged by senior University employees. Specifically, in October 2021, Senior Vice President of Communications, Scott Lamb ("Mr. Lamb") was removed from his position for blowing the whistle on the inadequacy of the University's efforts to address sexual assault.

65.     Since being terminated, according to media reports, Lamb has publicly stated regarding Liberty's actions, "Concerns about sexual assault would go up the chain and then die," he has said. It was "a conspiracy of silence."

---

[2] Liberty University faces a separate retaliation lawsuit in this district from a former senior university official, Scott Lamb, (Case No. 6:21-CV-00055-NKM) and separate allegations similar to this Plaintiff are alleged by 22 other Jane Doe Plaintiffs in *Jane Does 1-12 v. Liberty University, Inc.*, in the Eastern District of New York, (Case No. 2:21-CV-03964-JMA-ARL). According to the docket report in the E.D.N.Y matter, there are currently ten Jane Doe though an additional 12 are anticipated to join in the future should the parties fail to achieve settlement via mediation.

66.     Mr. Lamb's statements and descriptions of the University's inadequate response to serious sexual assaults generally are consistent with the mishandling of the Plaintiff's sexual assault in this case.

67.     At the times relevant to these allegations, Mr. Lamb also served as the direct supervisor of the director of the student group who expressed retaliatory animus against the Plaintiff as described in ¶44, *et seq*.

## LIBERTY UNIVERSITY'S INADEQUATE MECHANISM FOR REPORTING AND INVESTIGATING SEXUAL ASSAULT

68.     Liberty University has knowingly and intentionally created a campus environment where sexual assaults and rapes are foreseeably more likely to occur than they would in the absence of Liberty's policies.

69.     Broadly speaking, Liberty University has misdirected sexual victims into not reporting or pursuing claims and has actually used the Title IX investigative process as a tool to interfere with and obstruct claimants from reporting sexual assaults and having their assailants punished, thus subverting the act itself and essentially becoming aiders and abettors of the violence they commit.

70.     Liberty fostered an inadequate mechanism for addressing sexual assault by (a) weaponizing the student honor code called "the Liberty Way," making it difficult or impossible for students to report sexual violence and (b) facilitating an unhurried and insensitive process of investigating and addressing sexual violence, despite having robust Title IX and Discrimination, Harassment and Sexual Misconduct policies, leaving victims forced to face their attackers during the investigations and around campus.

## THE WEAPONIZATION OF THE LIBERTY WAY

71.     Liberty University maintains an honor code it calls the "Liberty Way." All Liberty

students must affirmatively agree to this policy by signature during their freshmen orientation. It is believed that records of these signed honor codes are kept internally.

72.    Instead of this policy shielding students as it claims to, it has been brandished as a sword for the University to create fear in students over the repercussions of reporting prohibited behaviors.

73.    The Liberty Way claims to prohibit sexual harassment, discrimination and assault, and notes that all "members of the Liberty community are expected to treat everyone with a spirit of Christian love, mutual respect, and individual dignity."

74.    The University purports to offer support programs "to promote our commitment to biblical principles of abstinence and purity."

75.    The Liberty Way specifically provides that unmarried students may not engage in consensual sexual conduct of any kind:

> Sexual relations outside of a biblically ordained marriage between a natural-born man and a natural-born woman are not permissible at Liberty University. In personal relationships, students are encouraged to know and abide by common-sense guidelines to avoid the appearance of impropriety. Activities outside of these standards and guidelines are violations of the Student Honor Code.

76.    The Liberty Way goes on to explain that this provision is violated by "inappropriate personal contact, visiting alone with the opposite sex at an off-campus residence; entering the residence hallway, quad, or on-campus apartment of the opposite sex or allowing the same, or visiting any dwelling or residence with a member of the opposite sex in inappropriate circumstances."

77.    Liberty University would issue offending students eighteen "points," fine students $250, and require them to perform eighteen hours of community service if they committed a "minor infraction", including: (a) intentionally attended an event where alcohol is served; (b) were in "any state of undress with member of opposite sex"; or (c) watched an NC-17 rated film or

played an "A" rated video-game.

78.     The Liberty Way authorized the University to expel students who were guilty of sexual "immorality" or for "spending the night with a member of the opposite sex" and for "possession or consumption of alcoholic beverages."

79.     The Liberty Way contains a policy regarding self-reports. That policy provides that if a self-report is made within one-week of the misconduct, and there is no pre-existing investigation into the offense, then the Dean of Students Office "will work with the student in setting the necessary boundaries and accountability measures in place to foster an environment for growth."

80.     In other words, the self-reporting policy does not explicitly provide amnesty from the imposition of points, fines, or expulsion, but only provides that self- reporting students will be required to undergo counseling to set "boundaries" and "accountability measures" without further clarification. Moreover, the purported amnesty is only available for the first ten days following an 'offense.' This term is not clearly defined, leaving survivors of sexual violence, including assaults, without clear guidance on how to react to situations where they have been victimized.

81.     The Liberty Way includes another exception with respect to reports by the victims of witnesses of sexual violence:

> **In order to encourage reports of conduct prohibited under this policy, an alleged victim or cooperating witness that may have been involved in a Code of Honor violation who makes a voluntary report or gives evidence to the Title IX Office related to a Title IX investigation, will be treated similarly to a Self-Report for Honor Code purposes.** For example, if an alleged victim or cooperating witness reports a Title IX violation or gives truthful testimony in support of a Title IX investigation and that report or testimony implicates a student as having been involved with another Code of Honor violation (e.g., alcohol, immorality), the cooperating witness will not be sanctioned for that conduct. Under this provision, a cooperating witness may be asked to participate in development opportunities or educational services.

14

82.     This provision is confusing, at best, because it (a) equates a report to Title IX to a self-report, which is time-limited and does not offer an explicit amnesty but, instead, makes clear that the University may impose "accountability measures"; (b) claims that those who report to Title IX will not be sanctioned for violations of the Liberty Way; and (c) imposes the obligation on reporters to participate in "developmentopportunities" and "educational services." This policy does not provide victims of sexual violence enough information to understand the consequences of reporting.

83.     The Liberty University Discrimination, Harassment, and Sexual Misconduct Policy also addresses reporting. The Policy notes that "to encourage reporting, testimony and other participation in processes outlined in this Policy, the University maintains a policy of offering Complainants, Respondents and Witnesses of Prohibited Conduct…amnesty from minor policy violations [of the Liberty Way] related to the incident" and not pursue disciplinary actions… "for disclosure of personal consumption of alcohol and other drugs (underage or illegal) or immortality (e.g., premarital sex), where such disclosures are made in connection with a good faith report or complaint of Prohibited Conduct."   The policy was in place during all times relevant to the Complaint and is attached as **Exhibit A**.

84.     The Policy also prohibits retaliation in the form of "conduct that has a materially adverse effect on the working, academic, or other University-controlled environment of the person, or that hinders or prevents the person from effectively carrying out her or his University responsibilities" taken against a person as a result of his or her participation in a protected activity.

85.     The Discrimination, Harassment and Sexual Misconduct Policy also states that "in case of a conflict between this Policy and another University policy, this Policy will govern", suggesting that the guidance in this Policy supersedes even the Liberty Way. This seems to

15

preclude the University from punishing students for actions disclosed during reporting.

86.    Despite this policy students who were the victims of sexual violence reported their assaults to the University through Resident Advisors and were urged to withdraw those reports because they involved admitted violations of the Liberty Way. Those students were told that their reports would subject them to discipline that could include expulsion. They, apparently, did not qualify for the amnesty, though no explanation for why was given.

87.    Students declined to report assaults against them altogether because of the stories they heard from other victims and witnesses about how the University punished the victims of sexual violence.

88.    Students who actually self-reported their assaults to the University were disciplined for violating the Liberty Way and fined in spite of their prompt report.

89.    By weaponizing the Liberty Way, the University has created an environment where students are afraid to seek help, even after experiencing highly traumatic events.

## THE FAILURE TO ENFORCE TITLE IX AND THE LIBERTY UNIVERSITY DISCRIMINATION, HARASSMENT AND SEXUAL MISCONDUCT POLICY

90.    Liberty University also has a Title IX Policy and a Discrimination, Harassment, and Sexual Misconduct Policy. The Title IX policy is occasionally updated and versions from 2015 through the present are available online in appendices to Liberty University's Clery Act reports. The Discrimination, Harassment, and Sexual Misconduct Policy is also available online as a linked file directly accessible through the digitally published Liberty Way.

91.    The Title IX Policy webpage contends that "Liberty University strongly encourages the reporting of all forms of sexual harassment, discrimination or assault" and if students "are not sure if an incident qualifies as a violation of the Policy on Sexual Harassment, Discrimination or Assault", they can contact the Office of Equity & Inclusion for support.

92.     The same webpage also states:

Liberty University will provide prompt, compassionate and discreet support services to victims. When a student contacts the University's Title IX Office, he/she will be given the opportunity to make a formal complaint with the Office. Immediate steps will be taken to inquire or investigate a complaint, stop the occurrence of the harassment/violence, protect and prevent re-occurrence, provide support and resources to those affected or involved and ensure the safety of the campus/community. Both interim measures and reasonable accommodations are available to affected parties. Reporting parties will review a Notification Checklist to ensure that the reporting parties are aware of resources and appropriate accommodations.[3]

93.     The Discrimination, Harassment, and Sexual Misconduct Policy further claims that "the University will respond to all reports of Prohibited Conduct [including sexual harassment and violence] with measures designed to eliminate the Prohibited Conduct, prevent its recurrence, and remedy any adverse effects of such conduct on persons, members of the campus community and University-related programs and activities."

94.     Despite this language, as well as the dedicated Title IX coordinator and support of the Office of Equity & Inclusion, Liberty University has a highly deficient sexual assault reporting and investigation process.

95.     Liberty University also failed to follow its own procedures for addressing acts of sexual violence as set forth in the Discrimination, Harassment and Sexual Misconduct Policy.

96.     The Policy proports that "the University is committed to providing a prompt, thorough, equitable and impartial resolution of all reported violations of this Policy."

97.     An Addendum to the Discrimination, Harassment and Sexual Misconduct Policy entitled "Supportive Measures Resource" notes that "Upon receiving a report or complaint of Prohibited Conduct, the University will provide reasonable and appropriate supportive measures

---

[3]     *See How do I report?*, LIBERTY UNIVERSITY (last visited Aug. 10, 2021), https://www.liberty.edu/title-ix/how-to-report/.

designed to preserve the Parties' educational experiences; to protect the Parties during the investigation and resolution of a matter; to address safety concerns of the Parties or other affected members of the campus community; to maintain the integrity of the investigative and resolution processes; and to deter Retaliation."

98.     This guidance goes on to note that "Complainants will be offered supportive measures designed to restore or preserve the complainant's equal educational access, regardless of whether a grievance process is ever initiated or their desire to receive them (i.e., refuses the offer of supportive measures)." Although the Support Measure Resource does not mandate a specific course of action, it is clear that at least some action should be taken.

99.     Any investigation of Plaintiff's claims resulted in the University taking no action against Mr. Tippet whatsoever. Despite their polices, the University implemented no support plan, provided no interim measures or reasonable accommodations.

100.    Because of this, Shea Whitehurst  was forced to see Mr. Tippett around campus, attend classes with him, and he remained President of a highly visible University affiliated student group.

101.    Plaintiff reorganized her schedule to take all online classes independently in order to avoid additional contact with Tippett.

102.    Although there were times when Plaintiff was less responsive to the Title IX office, the Discrimination, Harassment and Sexual Misconduct Policy states that "it is understood that there may be circumstances in which a Complainant or a Respondent wishes to limit her or his participation. However, the University may move forward with an investigation…and will not draw any adverse inference from a Complainant's or a Respondent's decision not to participate in the investigation or any form of resolution under this Policy."

103.     The University's investigation process was highly deficient and should not have been dependent on Plaintiff's availability to participate. After the University did so little to help Plaintiff avoid Tippett on campus, it is understandable why Plaintiff may have wanted to scale back her involvement.

104.     Further, despite the 2020 changes to federal Title IX policy limiting a college's and university's responsibility for sexual assaults taking place away from the physical campus, the Policy explicitly notes that "The University may also extend jurisdiction to off-campus conduct when the Executive Director/Title IX Coordinator determines that the conduct affects a substantial University interest, even if the University does not have substantial control over the context in which the alleged Prohibited Conduct occurs."

105.     In short, Liberty University weaponized its sexual violence reporting and poorly facilitated investigation policies, resulting in students, including Plaintiff, facing greater emotional trauma.

### COUNT I: PRE-ASSAULT DELIBERATE INDIFFERENCE/HOSTILE ENVIRONMENT
**(Against Liberty University)**

106.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

107.     Liberty University had actual knowledge prior to the above-described assault that its policies and procedures, as written and implemented, were enabling on-campus rapes and other serious sexual assaults.

108.     Indeed, it is alleged on information and belief that Liberty University had specific policies (Title XI and Discrimination, Harassment and Sexual Misconduct), set forth above, to suppress complaints of sexual assault, rape, and other types of sexual harassment, and support accused campus predators.

109.    Liberty University deliberately ignored these policies, deeply harming Plaintiff as well as many of her peers.

**WHEREFORE**, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Liberty University in an amount to be decided at trial, together with attorneys' fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgement interest.

## COUNT II: POST ASSAULT DELIBERATE INDIFFERENCE
### (Against Liberty University)

110.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

111.    Following of the assault described above, high-ranking members of the University's management and Title IX program became aware of the facts underlying the Plaintiff's injuries.

112.    In spite of that knowledge, the University either failed to take any action, or actively worked against the Plaintiff by destroying evidence of her assault and issuing sanctions against her.

113.    In failing to take any action after learning of Whitehurst's assault, the University defied its own procedures as set forth in the Title IX and Discrimination, Harassment and Sexual Misconduct policies.

**WHEREFORE**, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Liberty University in an amount to be decided at trial, together with attorneys' fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgement interest.

## COUNT III: HOSTILE ENVIRONMENT
### (Against Liberty University)

114.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

115.    The Liberty Way and its weaponization by Liberty University, as well as Liberty University's well-documented pattern of discrimination against women victims and in favor of male assailants, created an atmosphere on campus that was permeated with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive to alter the conditions of the education and create a sexually hostile environment for the Plaintiff.

*WHEREFORE*, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Liberty University in an amount to be decided at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgement interest.

## COUNT IV: NEGLIGENCE
### (Against Liberty University)

116.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

117.    In the present case, as well as was the reality for countless other students who were the victims of sexual violence, the University recklessly, wantonly, and carelessly made the Plaintiff's injuries more likely to occur and harder to prosecute because of the dangerous environment it created for students.

118.    The University is therefore directly liable in negligence for its role in causing their harms.

119.    The University's negligence was sufficiently reckless, wanton, and gross as to warrant the imposition of punitive damages.

**WHEREFORE**, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Liberty University in an amount to be decided at trial, together with fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgement interest.

## <u>COUNT V: ASSAULT</u>
### (Against Charles Tippett)

120.    The foregoing paragraphs are incorporated by reference as if fully set forth herein.

121.    Mr. Tippett engaged in harmful, offensive, and violent sexual bodily contact with Shea Whitehurst. Mr. Tippett's assault against Ms. Whitehurst was without her permission and against her will.

122.    Tippett intended to cause either harmful or offensive contact with Plaintiff, or the apprehension of such contact.

123.    Tippet's actions toward the Plaintiff created in her a reasonable fear or apprehension of imminent battery. Tippett did, in fact, commit a battery against the Plaintiff, which the Plaintiff fearfully perceived in the moments immediately preceding the contact. Tippett did so when the Plaintiff was physically helpless, and unable to escape from him.

124.    As a direct result of Tippett's assault and conduct as alleged in this complaint, Shea Whitehurst experienced severe physical injuries, all of which were reasonably foreseeable as a result of his actions. She has also experienced severe emotional trauma.

125.    As a direct result of Tippett's assault and conduct as alleged in this complaint, Shea Whitehurst also experienced severe psychological distress, which will likely be permanent. Ms. Whitehurst has symptoms consistent with Post-Traumatic Stress Disorder and has had to undergo counseling since the assault to address her mental health.

126.     Tippett's assault of Whitehurst was the proximate cause for serious psychological harm which Whitehurst experienced.

127.     Tippett is therefore liable for assault.

128.     Because Tippett's actions reflect willful disregard for the rights of Whitehurst, Whitehurst is entitled to punitive damages.

### COUNT VI: BATTERY
**(Against Charles Tippett)**

129.     The foregoing paragraphs are incorporated by reference as if fully set forth herein.

130.     Tippet's rape of the Plaintiff constitutes an intentional touching of the Plaintiff, which was performed beyond the bounds of Plaintiff's consent.  The rape occurred against her will, and possibly after he administered an intoxicating substance with the intention of incapacitating her.  Under the circumstances, Mr. Tippett's actions were not consented to, excused, nor justified.

131.     Tippett's acts caused Plaintiff serious physical and emotional pain, suffering, and medical expenses as further explained in this Complaint.

132.     As a direct result of Tippett's rape of Ms. Whitehurst and his other conduct as alleged in this complaint, Shea Whitehurst also experienced severe psychological distress, which will likely be permanent. Ms. Whitehurst has symptoms consistent with Post-Traumatic Stress Disorder and has had to undergo counseling since the assault to address her mental health.

133.     Tippett's rape of Whitehurst was the proximate cause of physical and psychological damages to Whitehurst.

134.     Tippett is therefore liable for battery.

135.     Because Tippett's actions reflect willful disregard for the rights of Whitehurst, Whitehurst is entitled to punitive damages.

*WHEREFORE*, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Charles Tippett in an amount to be decided at trial.

## COUNT VII: RETALIATION UNDER TITLE IX
### (Against Liberty University)

136.    When Ms. Whitehurst interacted with the Title IX office at Liberty University, she was engaged in protected activity under Title IX.

137.    By denying Ms. Whitehurst full access to all the rights, privileges, and participation in her university-affiliated group and by expressly stating that if she were to file suit against the University, she would be excluded from further or continued participation, the University engaged in retaliatory conduct.

138.    In his owns words, a University-affiliated director with supervisory authority over Ms. Whitehurst affirmed that the Defendant would take an adverse action against Ms. Whitehurst and deny her further and full participation in the internship if she sued the school.

139.    There was a causal connection between Ms. Whitehurst's protected activity and the adverse action of denying her full participation in her internship.  The statement directly cited to a lawsuit concerning potential assertion of Ms. Whitehurst's protected rights.

140.    There was a causal connection between Ms. Whitehurst's protected activity and a stated intention to deny her full participation in her internship if she engaged in litigation against the school.

141.    The University had a retaliatory motive in its dealings with Ms. Whitehurst.  The purpose and effect of the University representative's statement she "couldn't work with us…" was to discourage Ms. Whitehurst from pursuing her rights to engage in protected activity under Title

IX.  The deletion of her work and ignoring of her requests for explanation shows a material and adverse impact on her participation in student activities after her engaging in protected activity.

142.    The University representative and therefore the University itself had a retaliatory motive in making the statement that if she pursued a lawsuit, she would be excluded from further and full participation in her internship.

143.    In addition, the Title IX office was aware, from the date of the initial complaint, that the assault occurred off-campus, yet rather than disclaiming any authority over the assault, put Ms. Whitehurst through months of the informal and formal process, before dismissing her complaint.  This dismissal was based on information

## JURY DEMAND

144.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a jury on all issues so triable.

## PRAYER FOR RELIEF

*WHEREFORE*, based on the foregoing, the above-described Plaintiff respectfully requests that this Court award JUDGEMENT in her favor and against Liberty University and Mr. Tippet jointly and severally, in an amount to be decided at trial, but not less than $1.776 million, to the fullest extent permitted by law award additional punitive damages against Mr. Tippett for his intentional acts, and his malicious, wanton and willful disregard for the Plaintiff's rights, together with attorneys' fees and costs pursuant to the fee-shifting provisions of Title IX, as well as pre-and-post judgement interest.


Date:  October 14, 2022

Respectfully Submitted
**SHEA WHITEHURST**
by Counsel,

*/s/ Kevin E. Byrnes, Esq.*
Kevin E. Byrnes, VSB No. 47623
FH+H
1751 Pinnacle Drive, Suite 1000
Tysons, VA 22102
T: 703.590.1234
F: 703.590.0366
kbyrnes@fhhfirm.com
e-file@fhhfirm.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 14, 2022, the forgoing Amended Complaint was served on all counsel of record in this matter via the court's electronic filing (ECF) system.

*/s/ Grace Williams*
Grace Williams, Esq.